**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: GLUCAGON-LIKE PEPTIDE-1 RECEPTOR AGONISTS (GLP-1 RAS) NON-ARTERITIC ISCHEMIC OPTIC NEUROPATHY PRODUCTS LIABILITY LITIGATION | MDL NO. 3163<br><br>THIS DOCUMENT RELATES TO ALL CASES<br><br>JUDGE KAREN SPENCER MARSTON |
| DONALD H. TIPTON,<br><br>Plaintiff<br><br>v.<br><br>ELI LILLY and COMPANY, INC., NOVO NORDISK, INC., and NOVO NORDISK A/S,<br><br>Defendant(s). | COMPLAINT AND JURY DEMAND<br><br>CIVIL ACTION NO.: 2:26-cv-06585 |

**DIRECT FILING ORDER AND VENUE**

Plaintiff files this Complaint pursuant to the Direct Filing Order and is to be bound by the rights, protections, privileges, and obligations of the Direct Filing Order and other Orders of the Court. Further, in accordance with the Direct Filing Order, Plaintiff hereby designates the United States District Court for the Western District of Louisiana as Plaintiff's venue ("Original Venue"). Plaintiff makes this selection based upon one or more of the following factors:

__X__ Plaintiff currently resides in Lake Charles, Louisiana.

__X__ Plaintiff purchased, obtained, and used Defendants' Products within Louisiana.

_____ The Original Venue is a judicial district in which Defendants Eli Lilly and Company Inc., Novo Nordisk Inc., and Novo Nordisk A/S reside, and all Defendants are residents of the State in which the district is located (28 U.SC. § 1391 (b)(1)).

__X__ The Original Venue is a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, specifically, (28 U.SC. § 1391 (b)(2)).

_____ There is no district in which an action may otherwise be brought under 28 U.S.C. § 1391, and the Original Venue is a judicial district in which Defendants Eli Lilly and Company Inc, Novo Nordisk Inc., and Novo Nordisk A/S are subject to the Court's personal jurisdiction with respect to this action (28 U.SC. § 1391 (b)(3)).

_____ Other reason (please explain): ________________________________________

## COMPLAINT AND JURY DEMAND

COMES NOW, Plaintiff DONALD H. TIPTON, by and through the undersigned counsel, and brings this complaint against Defendants Novo Nordisk Inc. and Novo Nordisk A/S (sometimes hereinafter "Defendant," "Defendants," or "Novo Nordisk") and Eli Lilly and Company Inc. (sometimes hereinafter "Defendant" or "Eli Lilly") and for damages suffered by Mr. Tipton who was severely injured as a result of Eli Lilly and Novo Nordisk's (hereinafter "Defendants") widespread marketing of their drugs, Mounjaro and Ozempic, and his subsequent use of Mounjaro and Ozempic, injectable prescription medications that are approved for improvement of blood sugar (glucose) in adults with type 2 diabetes and weight loss, and alleges as follows:

## PARTIES

1. At all relevant times hereto, Plaintiff DONALD H. TIPTON was a resident and citizen of the State of Louisiana, residing in Lake Charles, Parish of Calcalsieu, Louisiana.

2. Plaintiff was prescribed and used Mounjaro and Ozempic as directed by his physician(s).

3. As a result of his use of Mounjaro and Ozempic, he suffers from right eye vision loss, secondary to the development of non-arteritic anterior ischemic optic neuropathy (NAION) and suffers physical and emotional injuries and radical changes to his lifestyle given his loss of sight.

4. Defendant Eli Lilly and Company, Inc. ("Eli Lilly") is an Indiana corporation that has its principal place of business at 893 South Delaware Street, Indianapolis, Indiana 46225.

5. Defendant Eli Lilly is a publicly traded company owned mostly by Lilly Endowment Inc.

6. Eli Lilly is the manufacturer of Mounjaro.

7. Upon information and belief, Eli Lilly failed to warn the end users of Mounjaro of the complications and devastating effects of which the company knew or should have known.

8. Upon information and belief, Eli Lilly failed to warn physicians of end users of Mounjaro of the complications and devastating effects of which the company knew or should have known, including NAION, which can result in blindness and permanent vision loss.

9. Upon information and belief, Eli Lilly's marketing was deceptive and misleading about the true risks associated with Zepbound and Mounjaro, risks which the companies knew or should have known.

10. At all times relevant, Eli Lilly was regularly engaged in the business of conducting substantial commerce, marketing, promoting, advertising, selling, and distributing pharmaceutical medications—specifically Mounjaro—throughout the State of Louisiana, which has one of the highest GLP-1 prescription rates per capita in the United States.

11. Defendant Novo Nordisk Inc. is a Delaware corporation with its principal place of business located at 800 Scudders Mill Road, Plainsboro, New Jersey 08536.

12. Defendant Novo Nordisk Inc. is wholly owned by Defendant Novo Nordisk US Commercial Holdings, Inc.

13. At all times relevant, Novo Nordisk Inc. was regularly engaged in the business of conducting substantial commerce, marketing, promoting, advertising, selling, and distributing pharmaceutical medications—specifically Ozempic—throughout the State of Louisiana, which has one of the highest GLP-1 prescription rates per capita in the United States.

14. Defendant Novo Nordisk A/S is a foreign public limited liability company organized under the laws of Denmark, with its principal place of business in Bagsvaerd, Denmark.

15. Defendant Novo Nordisk A/S is a global pharmaceutical company responsible for the research, development, testing, manufacturing, and design of the subject medication Ozempic.

16. Novo Nordisk A/S intentionally placed Ozempic into the global stream of commerce with the explicit knowledge, expectation, and intent that it would be marketed, distributed, and consumed by residents throughout the United States, including substantial distribution within the State of Louisiana. Furthermore, Novo Nordisk A/S has purposefully availed itself of Louisiana's market by conducting clinical trials and utilizing employees and agents to target Louisiana.

17. Defendant Novo Nordisk A/S and its subsidiaries and affiliated named herein are collectively referred to as “the Novo Nordisk Defendants” and “Novo Nordisk.”

18. The Novo Nordisk Defendants’ website states that “the vast majority of our U.S. injectable diabetes and obesity products are produced and packaged at the Clayton aseptic fill-

finish site. Upon information and belief, this refers to Novo Nordisk's manufacturing facility in Clayton, California, operated by Novo Nordisk Pharmaceutical Industries LP.

19. Upon information and belief, Novo Nordisk Pharmaceutical Industries LP is the labeler for Ozempic and Defendants Novo Nordisk A/S and Novo Nordisk Inc. are identified on Ozempic's label. The Novo Nordisk Defendants also designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and/or distributed Ozempic.

20. Upon information and belief, Novo Nordisk Defendants failed to warn the end users of Ozempic of the complications and devastating effects of which Defendants knew or should have known, including NAION, which can result in blindness and permanent vision loss.

21. Upon information and belief, Novo Nordisk Defendants failed to warn physicians of end users of Ozempic of the complications and devastating effects of which the companies knew or should have known, including NAION, which can result in blindness and permanent vision loss.

22. Upon information and belief, Novo Nordisk Defendants' marketing was deceptive and misleading about the true risks associated with the use of Ozempic, risks which the companies knew or should have known.

**JURISDICTION AND VENUE**

16. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) as the matter in controversy exceeds the value of $75,000, exclusive of interest and costs, and is between citizens of different states and/or a foreign state, as Plaintiff is a citizen of the State of LOUISIANA. Defendant Eli Lilly is a citizen of Delaware and Indiana. Defendant Novo Nordisk Inc. is a citizen of Delaware and. New Jersey. Defendant Novo Nordisk A/S is a citizen of Denmark. None of Defendants are either incorporated in, or have its principal place of business in, the State of LOUISIANA.

17. Plaintiff files this Complaint in the United States District Court for the Eastern District of Pennsylvania pursuant to Case Management Order No. 14 (Direct Filing Order) entered in MDL No. 3094. Plaintiff agrees to be bound by the rights, protections, privileges, and obligations established by said Direct Filing Order. This Court has personal jurisdiction over Defendants for the purposes of these consolidated pretrial proceedings pursuant to the terms of the Direct Filing Order.

18. Because this Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1332**,** it has the authority to hear and adjudicate Plaintiff's state law claims arising under the Louisiana Products Liability Act (LPLA) **a**nd Louisiana Civil Code.

19. Pursuant to Case Management Order No. 14, Plaintiff hereby designates the United States District Court for the Western District of Louisiana as Plaintiff's designated home venue ("Original Venue"). Venue would be proper in that Original Venue pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred, and the resulting physical injuries were sustained by Plaintiff, within that judicial district. Defendants routinely market Mounjaro and/or Ozempic ("Defendants' Products" or "their Products"), conduct substantial business, and placed the medication into the stream of commerce targeting that Original Venue.

## BACKGROUND

### I. The Development of Ozempic and Wegovy

20. In the early 1990s, Novo Nordisk researchers discovered that when they injected a chemical compound known as liraglutide—a GLP-1 (glucagon-like peptide-1) receptor

agonist—into laboratory rats, the drug caused the animal subjects to cease eating almost entirely.[1]

21. GLP-1 agonists are a class of medications that can help lower blood sugar levels and promote weight loss.[2] An agonist is a manufactured substance that attaches to a cell receptor and causes the same action as the naturally occurring substance.[3] Thus, GLP-1 agonists work by mimicking a naturally occurring GLP-1 hormone.

22. GLP-1 medications bind to GLP receptors to trigger the effects (or roles) of the GLP-1 hormone. The higher the dose of the GLP-1 agonist, the more extreme the effects.[4]

23. Novo Nordisk scientists noted during these pre-clinical trials that the test subjects essentially starved themselves, establishing that certain synthetic peptides played an integral role in central nervous system appetite. "These rats, they starved themselves," said one Novo Nordisk scientist, Lotte Bjerre Knudsen, in a video series released by the Novo Nordisk Foundation, "so we kind of knew there was something in some of these peptides that was really important for appetite regulation."[5]

24. Subsequent clinical testing in human subjects revealed that those who received an intravenous drip of a GLP-1 agonist consumed roughly 12% less at a meal buffet than human cohorts who received a placebo.[6]

---

[1] https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy.html (last visited Aug. 28, 2026).
[2] https://www.my.clevelandclinic.org/health/articles/13901-glp-1-agonists (last visited Aug. 28, 2026).
[3] *Id.*
[4] *Id.*
[5] https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy.html (last visited Aug. 28, 2026).
[6] *Id.*

25. Consequently, Defendants moved forward with exploring GLP-1 analogues not merely as glycemic control therapies for Type 2 diabetes, but as specialized interventions targeting clinical weight loss and chronic obesity management.[7]

26. In 2010, the U.S. Food and Drug Administration (FDA) approved Novo Nordisk's liraglutide injection under the brand name Victoza for Type 2 diabetes,[8] at which point Novo Nordisk moved forward with studying the drug for weight loss.[9]

27. After clinical trials, in 2014, the FDA approved a daily injectable version of liraglutide specifically indicated for obesity management under the brand name Saxenda.[10]

28. Saxenda's effects on weight loss, however, were modest; patients lost about 5% of their body weight.[11]

29. Seeking a more potent compound with a significantly longer metabolic half-life, Defendants designed, developed, and manufactured semaglutide, a human GLP-1 receptor agonist engineered with structural modifications to resist enzymatic degradation, extending its activity to roughly one week.[12]

30. Novo Nordisk branded semaglutide as Ozempic, and on December 5, 2016, the Novo Nordisk Defendant announced submission of Ozempic's new drug application (NDA) to the FDA for regulatory approval of a once-weekly injectable, in 0.5 mg or 1 mg doses, for treatment of Type 2 diabetes. In the announcement, Defendant represented that in clinical trials

---

[7] *Id.*
[8] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2957743/#:~:text=The%20incretin%20mimetic%20liraglutide%20(Victoza,adults%20with%20Europe%20and%20Japan (last visited Aug. 28, 2026).
[9] *Id.*
[10] *Id.*
[11] *Id.*
[12] *Id.*; https://ml.globenewswire.com/Resource/Download/d2f719el-d69f-4918-ae7e-48fc6b731183 (last visited Aug. 28, 2026).

"once-weekly" Ozempic had a safe and well-tolerated profile, and Defendant represented that the most common adverse event was nausea.[13]

31. In December 2017, the FDA approved Defendant's application and granted premarket approval as NDA 209637.[14]

32. When Novo Nordisk announced they had started selling Ozempic in the United States, the touted the medication as a "new treatment option[]" that "addresses the concerns and needs of people with diabetes[.]" Novo Nordisk offered an "Instant Savings Card to reduce copays to as low as $25 per prescription for up to two years."

33. In addition to diabetic control, Ozempic also caused 15% weight loss, which was three times the loss caused by its predecessor, Saxenda.[15]

34. Just one year after Ozempic's approval for diabetes, Defendant started a clinical trial in patients who were overweight or suffered from obesity.[16]

35. The results of the trial demonstrated that for participants who were overweight or obese, 2.4 mg semaglutide, once weekly, plus lifestyle intervention was associated with sustained, clinically relevant reduction in body weight.[17]

36. On March 20, 2019, Defendant submitted a supplemental new drug application (sNDA) for Ozempic 0.5 mg or 1 mg injection, requesting approval to expand its marketing of Ozempic by adding an indication to reduce the risk of major adverse cardiovascular events in

---

[13] *Id*.
[14] https://www.accessdata.fda.gov/Ozempicatfda_docs/appletter/2017/209637s000ltr.pdf (last visited Aug. 28, 2026).
[15] https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy.html (last visited Aug. 28, 2026).
[16] *Id*.
[17] https://www.nejm.org/doi/full/10.1056/NEJMoa2032183 (last visited Aug. 28, 2026).

adults with type 2 diabetes and established cardiovascular disease.[18] On January 16, 2020, the FDA approved this new indication.[19]

37. By March of 2021, Defendant had completed the clinical trial studying semaglutide for weight loss, and its results were published March 18, 2021.[20]

38. In addition to the results, the published study, which was funded by Defendant, argued: "Obesity is a chronic disease and global public health challenge."[21]

39. Then, on May 28, 2021, Defendant submitted another sNDA requesting approval for a higher, 2 mg dose of Ozempic injection. On March 28, 2022, the FDA approved this request.[22]

40. In its press release, Defendant represented Ozempic as having "proven safety and efficacy" and Defendant continued to advertise that "it can help many patients lose some weight."[23] As with its prior press releases, Defendant disclosed Important Safety Information and provided links to the Medication Guide and Prescribing Information. However, severe gastrointestinal events, including gastroparesis and gastroenteritis, were not identified as risks. Nor was there any disclosure about risks of vision loss, including NAION.

41. On September 22, 2023, Novo Nordisk added "ileus" under Section 6-3 Postmarketing Experience of the Prescribing Information ("PI" or "label") in a revised Ozempic label.

---

[18] https://www.prnewswire.com/news-release/novo-nordisk-files-for-us-fda-approval-of-oral-semaglutide-for-blood-sugar-control-and-cardiovascular-risk-reduction-in-adults-with-type-2-diabetes-300815668.html (last visited Aug. 28, 2026).

[19] https://www.accessdata.fda.gov/Ozempicatfda_docs/appletter/2020/209637Orig1s003ltr.pdf (last visited Aug. 28, 2026).

[20] https://www.nejm.org/doi/full/10.1056/NEJMoa2032183 (last visited Aug. 28, 2026).

[21] *Id*.

[22] https://www.accessdata.fda.gov/Ozempicatfda_docs/appletter/2020/209637Orig1s009ltr.pdf (last visited Aug. 28, 2026).

[23] https://www.prnewswire.com/news releases/novo-nordisk-receives-fda-approval-of-higher-dose-ozempic-2-mg-providing-increased-glycemic-control-for-adults-with-type-2-diabetes-301512209.html (last visited Aug. 28, 2026).

42. The new label listed ileus as an adverse reaction reported during post-approval use of semaglutide, the active ingredient in Ozempic.[24]

43. On September 6, 2024, the FDA notified Novo Nordisk of new safety information that it determined should be included in the labeling for GLP-1 RAs pertaining to the risk of pulmonary aspiration during general anesthesia or deep sedation.

44. On October 4, 2024, Novo Nordisk submitted a supplemental new drug application (sNDA 209637/S-032) and amendments for Ozempic incorporating the FDA's required safety modifications to the label.

45. On November 1, 2024, the FDA provided supplemental approval for sNDA 209637/S-032.[25]

46. No version of the Ozempic label has warned patients or their doctors that taking Ozempic may cause NAION or result in permanent vision loss.

47. At all relevant times, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, distributing, and promoting Ozempic and placed this medication into the stream of commerce in an unreasonably dangerous condition under their ultimate supervision and control.

## II. The Development and Approval of Mounjaro and Zepbound

48. Following the success of Novo Nordisk's Ozempic, scientists and other pharmaceutical companies began exploring the possibilities of combining GLP-1 RAs with other compounds.

---

[24] Ozempic Label (dated 9/22/23), available at https://www.accessdata.fda.gov/drugsatfda_docs/label/2023/209637s0202s021lbl.pdf.

[25] FDA Supplement Approval Letter for NDA 209637/S-032 (Ozempic), available at https://www.accessdatafda.gov/drugsatfda_docs/appletter/2024/209637Orig1s)32ltr.pdf.

49. In the early 2010s, a team of scientists at Indiana University discovered the core unimolecular technology of combining GLP-1 and GIP into a single molecule which directly inspired Eli Lilly to later develop tirzepatide, Mounjaro's active ingredient.[26]

50. GIP stands for glucose-dependent insulinotropic polypeptide. It is a natural hormone that works alongside GLP-1 to help control blood sugar and promote weight loss by signaling the pancreas to release insulin, slow stomach emptying, and increase feelings of fullness.[27]

51. In pre-clinical trials, obese rats given tirzepatide were observed to decrease their food intake, decrease their body weight and improve their glucose tolerance.[28]

52. Rats given tirzepatide were more likely to develop thyroid C-cell tumors. The offspring of pregnant rats given tirzepatide had fetal abnormalities.[29]

53. From 2018 to 2021 Eli Lilly conducted clinical trials collectively known as SURPASS.[30]

54. From 2019 to 2023, Eli Lilly conducted five additional clinical trials collectively known as SURMOUNT to test the effectiveness, safety, and long-term benefits of tirzepatide for chronic weight management in adults with obesity.[31]

55. The SURMOUNT-4 Trial, "was a study of tirzepatide with obesity or weight. The main purpose was to learn about how tirzepatide maintained body weight loss. The study

---

[26] https://www.science.org/doi/10.1126/science.adq6452 (last visited Aug. 30, 2026).
[27] https://phelpshealth.org/news/featured-stories/understanding-mounjaro-guide-type-2-diabetes-patients#:~:text=A%20delicate%20balance:%20Glucagon%20is (last visited August 30, 2026).
[28] https://www.accessdata.fda.gov/drugsatfda_docs/nda/2022/215866Orig1s000PharmR.pdf (last visited Aug. 30, 2026).
[29] https://www.accessdata.fda.gov/drugsatfda_docs/label/2025/215866s039lbl.pdf (last visited Aug. 30, 2026).
[30] https://diabetes.org/newsroom/latest-data-from-SURPASS-trials-demonstrate-tirzepatide-provided-blood-sugar-reductions-weight-loss#:~:text=Blood%20Sugar%20Reductions- (last visited Aug. 30, 2026).
[31] https://www.lilly.com/en-ca/news/press-releases/tirzepatide-surmount-5-h2h (last visited Aug. 30, 2026).

had two phases: a lead-in phase in which all participants took tirzepatide and a treatment phase in which participants either continued tirzepatide or switched to placebo. The study lasted about 2 years (25 visits).[32]

56. The final trial, SURMOUNT-5, compared tirzepatide to Wegovy.[33]

57. Eli Lilly was already testing the drug's effectiveness for chronic weight management before it had been approved for Type 2 diabetes. Eli Lilly submitted a new drug application (NDA 215866) for tirzepatide under their brand name Mounjaro on September 15, 2021.[34]

58. The FDA approved Mounjaro on May 13, 2022 for the regulation of type 2 diabetes.[35]

59. Eli Lilly continues to be the holder of the NDA and therefore is required to submit supplements to the NDA, complete post-marketing surveillance, submit adverse event reports, maintain correspondence with the FDA and update the label.

60. The FDA's approval was based on the first nine SURPASS and SURMOUNT trials.[36]

61. In a news release dated May 13, 2022, Eli Lilly reported that "While not indicated for weight loss, Mounjaro led to significantly greater weight reductions versus comparators in a key secondary endpoint."[37]

---

[32] https://clinicaltrials.gov/study/NCT04660643 (last visited Aug. 30, 2026).
[33] *Id*.
[34] https://www.govinfo.gov/content/pkg/FR-2024-02-29/html/2024-04157.htm (last visited August 30, 2026).
[35] https://www.fda.gov/drugs/drug-trials-snapshots/drug-trials-snapshots-mounjaro#:~:text=MOUNJARO%20 (last visited Aug. 30, 2026).
[36] *Id.*
[37] https://investor.lilly.com/news-releases/news-release-details/fda-approves-lillys-mounjarotm-tirzepatide-injection-first-and https://investor.lilly.com/news-releases/news-release-details/fda-approves-lillys-mounjarotm-tirzepatide-injection-first-and (last visited on August 30, 2026).

62. In a news release dated October 6, 2022, the president of Lilly Diabetes, Mike Mason, stated "[o]besity is a chronic disease that impacts the health of nearly 100 million Americans and is a significant driver of healthcare costs… we are dedicated to helping people living with obesity through our research and development of innovative treatments like tirzepatide, which produced significant weight reductions in patients taking tirzepatide for type 2 diabetes in SURPASS."[38]

63. Eli Lilly acknowledges that Mounjaro is not a weight loss medication but simultaneously advertised its weight loss capabilities before the active ingredient, tirzepatide, was approved for chronic weight management by the FDA.[39]

64. On October 6, 2022, the FDA granted Fast Track designation for the investigation of tirzepatide for the treatment of obese adults or overweight adults with weight-related comorbidities.[40]

65. On November 17, 2022, Eli Lilly and Co. initiated a rolling submission for their Zepbound NDA (NDA 217806).[41]

66. The FDA dated and received the NDA on May 8, 2023.[42]

---

[38] https://investor.lilly.com/news-releases/news-release-details/lilly-receives-us-fda-fast-track-designation-tirzepatide (last visited Aug. 30, 2026).
[39] https://investor.lilly.com/news-releases/news-release-details/fda-approves-lillys-mounjarotm-tirzepatide-injection-first-and (last visited on August 30, 2026).
[40] https://investor.lilly.com/news-releases/news-release-details/lilly-receives-us-fda-fast-track-designation-tirzepatide (last visited Aug. 30, 2026).
[41] *Id.*
[42] Food and Drug Administration, Approval Letter for NDA 217806: Zepbound (tirzepatide) injection (May 8, 2023) (received and dated date of complete filing).

67. The FDA approved tirzepatide under Eli Lilly's brand name Zepbound on November 8, 2023 for chronic weight management in adults with obesity or adults who are overweight with at least one weight-related condition.[43]

68. According to a November 19, 2025 summary of risk management plan released by Eli Lilly, patients with a history of proliferative diabetic retinopathy, non-proliferative diabetic retinopathy, and diabetic maculopathy were excluded from the tirzepatide clinical trial development program.[44]

69. On their website, Defendant Eli Lilly does disclose important safety information and provides a link to its medication guide and prescribing information. However, Defendant Eli Lilly does not specify NAION or permanent vision loss as a risk when taking tirzepatide for either diabetes management or weight management.[45]

## III. Novo Nordisk Creates a Market: Millions Spent on Marketing and Promotion Create a Media Frenzy and Mega Seller

70. Novo Nordisk was not permitted to market Ozempic for weight loss without FDA approval for that specific indication,[46] but before Ozempic ever received separate approval for treatment of weight loss, Novo Nordisk had already begun mentioning weight loss in its Ozempic commercials.[47]

---

[43] https://www.fda.gov/news-events/press-announcements/fda-approves-new-medication-chronic-weight-management (last visited Aug. 30, 2026).
[44] Eli Lilly and Company. "Summary of the Risk Management Plan for Mounjaro (Tirzepatide)." European Medicines Agency. November 19, 2025.
[45] https://mounjaro.lilly.com/how-to-use-mounjaro?gclsrc=aw.ds&gad (last visited August 30, 2026).
[46] https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy.html (last visited Aug. 28, 2026).
[47] *Id*.

71. On July 30, 2018, Novo Nordisk launched its first television ad for Ozempic to the tune of 1970s hit pop song "Magic" by Pilot, wherein Novo Nordisk advertised that 'adults lost on average up to 14 pounds" when taking Ozempic.[48]




72. Over the next five years, Novo Nordisk spent $884,000,000 running television ads in the United States to promote its semaglutides, Ozempic, Wegovy, and its lesser-known GLP-1 agonists, Rybelsus, with most advertisements allocated towards Ozempic.[49]

73. Defendants also employed sophisticated use of social media to market Ozempic.

74. On TikTok, the hashtag #Ozempic had 273 million views as of November 22, 2022,[50] and currently has over 1.2 billion views.[51]

75. Novo Nordisk partnered directly with Meta and Instagram to run marketing campaigns. One diabetes marketing campaign achieved a dramatic 28% direct engagement rate with their polls.[52] This was a lauded result presented in a case study by Meta.

---

[48] *Id*.
[49] https://medwatch.com/News/Pharma_Biotech/article15680727.ece (last visited August 28, 2026).
[50] https://www.nytimes.com/2022/11/22/well/ozempic-diabetes-weight-loss.html (last visited August 28, 2026).
[51] https://www.tiktok.com/tag/ozempic; https://theconversation.com/ozempic-the-miracle-drug-and-the-harmful-idea-of-a-future-without-fat-211661 (last visited Aug. 28, 2025).
[52] https://business.instagram.com/success/novo-nordisk (last visited August 28,2026).

76. Novo Nordisk reportedly spent approximately one hundred million dollars advertising Ozempic in 2022.[53] Ozempic ranked as the sixth most advertised prescription drug brand in 2022, with a U.S. measured media spend of $181 million, according to Vivvix spending data and Pathmatics paid social data as reported in Ad Age Leading National Advertisers 2023.[54]

77. On July 10, 2023, a global media company declared Ozempic as "2023's buzziest drug" and one of the "Hottest Brands, disrupting U.S. culture and industry."[55]

78. In 2023, over $491 million was spent advertising "diabesity" drugs, including Ozempic and Wegovy.[56]

79. Jimmy Kimmel joked about Ozempic at the Oscars.[57]

80. Howard Stern has joked and discussed Ozempic.[58] Interestingly, Stern notes that the "catchy" them song "distracts" the listener from actually hearing any of the listed side effects.[59]

81. Novo Nordisk has spent millions of dollars delivering their message to physicians, healthcare providers, and consumers.

82. For example, according to Open Payments Data, Novo Nordisk consistently invested tens of millions annually in traditional physician marketing and detailing. [60] The

[53] https://www.newyorker.com/magazine/2023/03/27/will-the-ozempic-era-change-how-we-think-about-being-fat-and-being-thin (last visited Aug. 28, 2026).
[5454] https://adage.com/article/special-report-hottest-brands/ozempic-hottest-brands-most-popular-marketing-2023/2500571?utm_source=exchange&utm_medium=email&utm_campaign=t5687390 (last visited Aug. 28, 2026).
[55] https://adage.com/article/special-report-hottest-brands/ozempic-hottest-brands-most-popular-marketing-2023/2500571 (last visited August 28, 2026).
[56] https://www.mmm-online.com/home/channel/spending-on-ozempic-wegovy-surges/ (last visited Aug. 28, 2026).
[57] https://www.usatoday.com/story/life/health-wellness/2023/03/13/ozempic-sweeping-hollywood-celebrities-weight-loss/114288-1002/ (last visited Aug. 28, 2026).
[58] https://www.youtube.com/watch?v=QD-nCQn1Ads (last visited Aug. 28, 2026).
[59] *Id*.
[60] https://openpaymentsdata.cms.gov/company/100000000144 (last visited Aug. 29, 2026).

company spent over $33 million in 2022, followed by $22 million in 2023, $25 million in 2024, and more than $36 million in 2025.[61]

83. In sum, Novo Nordisk promoted the safety, efficacy, and sale of Ozempic in the United States on its websites, in press releases, through in-person presentations, through the drug's label, in print materials, on social media, and to and/or through advocacy groups, lobbying groups, celebrity partnerships, telehealth partnerships, key opinion leaders, and other public outlets.

84. However, throughout their marketing, Defendants failed to disclose the true serious side effects of Ozempic, including but not limited to hospitalization and death.

## IV. Eli Lilly Aggressively Marketed and Promoted Mounjaro and Zepbound

85. Eli Lilly launched a digital campaign for Mounjaro in January of 2023.[62]

86. On February 12, 2023, the same day as the Super Bowl LVII, Defendant Eli Lilly aired a 75-second advertisement for Mounjaro on FOX titled "What If?". [63]

87. This advertisement kicked off a commercial campaign that included at least seven other commercials, two of which featured Olympic athlete Simone Biles.[64, 65]

88. In March of 2023, Eli Lilly spent $21.4 million on Mounjaro TV advertisements, placing it in the top five of pharmaceutical companies who spent the most on TV advertisements for that month.[66]

---

[61] *Id.*
[62] https://xtalks.com/eli-lilly-spends-big-on-first-mounjaro-tv-commercial-for-diabetes-3424/#:~:text=Mounjaro%20received%20US%20Food%20and (last visited Aug. 30, 2026).
[63] https://www.ispot.tv/ad/1VpJ/mounjaro-what-if#:~:text=More%20Mounjaro%20Commercials- (last visited Aug. 30, 2026).
[64] https://www.ispot.tv/ad/BkSt/mounjaro-i-see-you-featuring-simone-biles (last visited Aug. 30, 2026).
[65] https://www.ispot.tv/ad/6mcG/mounjaro-olympics-working-hard-featuring-simone-biles (last visited Aug. 30, 2026).
[66] https://www.fiercepharma.com/marketing/eli-lillys-new-tv-spot-diabetes-med-mounjaro-leaps-top-dtc-ad-spenders-list (last visited Aug. 30, 2026).

89. An advertisement aired as part of their "What If" series, indicated that "Mounjaro is not a weight loss drug" in small font at the bottom of the screen, but also clearly indicated that Mounjaro can help decrease how much food you eat.[67]

90. In May of 2025, Eli Lilly launched a marketing campaign titled "Duets for Type 2 Diabetes" featuring *Modern Family* actor Eric Stonestreet.[68]

91. As part of their paid partnership, a promotional video was released on May 2, 2025, featuring the actor and his mother who both have Type 2 diabetes and use Mounjaro.[69]

92. In this video, Eric Stonestreet referred to Mounjaro as a "teammate" that helped him manage his type 2 diabetes and related symptoms.[70]

93. Stonestreet also stated that they participated in the paid partnership because they wanted to inspire others to talk to their doctors about Mounjaro.[71]

94. On April 11, 2023, the New York Times reported that some research has found that "Mounjaro may be even more powerful than either Ozempic or Wegovy." It also reported that "many people [are] using it off-label to lose weight."[72]

95. Although a representative from Eli Lilly denied promoting or encouraging "the off-label use of any of [their] medicines," Eli Lilly was clearly interested in using tirzepatide for chronic weight management.[73]

---

67 https://www.ispot.tv/ad/fWgz/mounjaro-what-if (last visited Aug. 30, 2026).
68 https://mounjaro.lilly.com/duets (last visited Aug. 28, 2026).
69 *Id.*
70 *Id.*
71 *Id.*
72 *Id.*
73 *Id.*

96. In March of 2024, Oprah Winfrey hosted a television special titled "An Oprah Special: Shame, Blame, and the Weight Loss Revolution" where she was joined by representatives from Eli Lilly and Novo Nordisk who discussed their respective weight loss medications.[74]

97. This special featured Dr. W. Scott Butsch and Dr. Amanda Velazquez who are both paid consultants and have received research funding from Eli Lilly. The video also features Rhonda Pacheco, Group Vice President of Diabetes and Obesity for Eli Lilly.[75]

98. Subsequently, the FDA issued a warning letter to both Defendants for their misleading drug advertisements determining that the media was false or misleading.[76]

99. In the letter, the FDA claimed that Novo Nordisk and Eli Lilly discussed the benefits of their medications while omitting or understating the risks associated with these medications and the warnings associated with each drug.[77]

100. In early 2024, Eli Lilly launched a campaign titled "Get Better" with a new focus on obesity.[78]

101. Eli Lilly aired two films showcasing its "point of view around obesity—emphasizing [its] commitment to patients by highlighting the seriousness of this disease and the appropriate use of anti-obesity medicines."[79]

---

[74] https://www.fiercepharma.com/marketing/oprah-shines-her-star-power-glp-1s-new-weight-loss-drugs-tv-special#:~:text=When%20Winfrey%20asked%20why%20coverage (last visited on Aug. 30, 2026).
[75] https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/eli-lilly-and-company-716485-09092025 https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/eli-lilly-and-company-716485-09092025 (last visited on Aug. 30, 2026).
[76] *Id.*
[77] https://www.pharmexec.com/view/fda-warning-letters-novo-nordisk-eli-lilly-hims-regarding-misleading-advertising (last visited Aug. 30, 2026).
[78] https://investor.lilly.com/news-releases/news-release-details/lillys-newest-phase-get-better-campaign-challenges (last visited on Aug. 30, 2026).
[79] *Id.*

102. The second film, titled "Big Night" was released in March of 2024 during the Oscars.[80]

103. Eli Lilly has also invested in a branding campaign titled "A Medicine Company" intended to strengthen Eli Lilly's brand as a company that values "health above all" and as a pharmaceutical company that can be trusted.[81]

104. Lina Polimeni, chief corporate brand officer at Eli Lilly stated "[p]eople understand Lilly as a manufacturer of medicine, but don't always understand Lilly as a company or as a brand." Also, "[t]here's a big effort happening right now in building a brand that people love and trust — one that explains why we make medicine for people and tackle diseases that are so hard to treat."[82]

105. According to open payments data, Eli Lilly spent $7,745,971.25 on marketing/consulting/travel/food and beverage/etc. to physicians or medical institutions in 2024 alone.[83]

106. In 2023, the company spent $6,136,076.18 on the same.[84]

107. Eli Lilly has spent money on grants to various hospitals like the Tufts Medical Center to whom they gave $250 million dollars.[85]

108. By the end of 2022, Mounjaro had sales of $482.5 million. In 2023, its first full year on the market, Mounjaro brought in nearly $5.2 billion.[86]

---

[80] https://www.youtube.com/watch?v=lZ3Dt74R4ak (last visited on Aug. 30, 2021).
[81] https://www.adweek.com/brand-marketing/eli-lillys-big-task-become-a-loved-and-trusted-pharma-brand/ (last visited Aug. 30, 2026).
[82] https://www.campaignlive.com/article/lilly-building-brand-people-trust/1893652 (last visited Aug. 30, 2026).
[83] https://openpaymentsdata.cms.gov/company/100000000088 (last visited on August 30, 2026).
[84] *Id.*
[85] *Id.*
[86] https://www.pewresearch.org/short-reads/2024/03/21/as-obesity-rates-rise-in-the-us-and-worldwide-new-weight-loss-drugs-surge-in-popularity/ (last visited Aug. 30, 2026).

109. On December 18, 2023, Global Data reported that based on clinical data, sales for Mounjaro are forecasted at $27 billion by 2029.[87]

110. In 2024, Mounjaro was rated the ninth most sold drug, generating $11,540,100,000 dollars in sales.[88]

111. Eli Lilly spent approximately $8,593,800,000 dollars on marketing, selling, and administrative expenses in 2024.[89]

112. They spent $7,403,100,000 dollars on the same in 2023.[90]

113. By the second quarter of 2025, Mounjaro had surpassed Ozempic in sales at over $5 million.[91]

114. Mounjaro has experienced the highest monthly gross sales post-launch compared to some other GLP-1 RAs including Ozempic. As of September 13, 2025, Mounjaro was producing around $3 billion a month for Eli Lilly.[92]

115. A November 6, 2025 article published in the scientific journal *Nature* stated that tirzepatide was on track to be the top selling drug in the world in 2025.[93, 94]

116. While Merck's, blockbuster PD-1 inhibitor, Keytruda, kept its throne as pharma's best-selling drug for one more year, Eli Lilly's tirzepatide brands Mounjaro and

---

[87] https://www.globaldata.com/media/pharma/obesity-drug-mounjaro-to-surpass-ozempic-with-27-billion-sales-in-2029-forecasts-globaldata/ (last visited Aug. 30, 2026).
[88] https://www.drugdiscoverytrends.com/2024s-blockbusters-top-50-pharmaceuticals-by-sales/ (last visited Aug. 30, 2026).
[89] https://www.statista.com/statistics/517713/eli-lilly-marketing-expenses/?srsltid=AfmBOooh4INZhImNQmWYuAN77jRyz (last visited Aug. 30, 2026).
[90] Id.
[91] https://www.drugdiscoverytrends.com/top-25-drugs-by-sales-2025-h1/ (last visited Aug. 30, 2026).
[92] https://www.iqvia.com/locations/united-states/blogs/2025/09/obesity-deep-dive-the-unparalleled-launch-success-of-mounjaro-and-zepbound (last visited Aug. 30, 2026).
[93] https://www.nytimes.com/2025/11/21/health/eli-lilly-one-trillion-value-pharmaceuticals.html (last visited Aug. 30, 2026).
[94] https://www.nature.com/articles/d41573-025-00183-y (last visited Aug. 30, 2026).

Zepbound together made $36.51 billion in 2025, eclipsing the cancer powerhouse with fewer than four years in the market.[95]

117. Eli Lilly serves on the board and/or provides direct financial contributions to many public health advocacy groups, including the Obesity Action Coalition.[96]

118. Eli Lilly and Novo Nordisk are members of the Obesity Medicine Association's Corporate Council.[97]

119. They are platinum members of this council, meaning they contribute more than $100,000 annually to the coalition's general operating efforts.[98]

120. Eli Lilly has been a contributing supporter to the coalition since 2020, before any of its drugs were approved for weight loss.[99]

121. In sum, Defendant Eli Lilly promoted the safety, efficacy, and sale of Mounjaro in the United States on its websites, in press releases, through in-person presentations, through the drug's label, in print materials, on social media, advocacy groups, lobbying groups, celebrity partnerships, telehealth partnerships, key opinion leaders, and through other public outlets and has never disclosed NAION resulting in permanent vision loss as a risk of the medication.

122. On May 24, 2024, the Wall Street Journal reported that Eli Lilly spent $5.3 billion to boost manufacturing capacity for Zepbound and Mounjaro to ease shortages of the drugs. They referred to this investment as the "largest manufacturing investment in company history."[100]

---

[95] https://www.biospace.com/business/keytruda-hangs-on-to-best-seller-crown-as-glp-1s-gain-ground (last visited Aug. 31, 2026).
[96] https://www.obesityaction.org/corporate-council/ (last visited on August 31, 2026).
[97] https://obesitymedicine.org/resources/vendor-directory/ (last visited on August 31, 2026).
[98] https://www.obesityaction.org/corporate-council/ (last visited Aug. 31, 2026).
[99] *Id.*
[100] https://www.wsj.com/health/pharma/eli-lilly-boost-supply-mounjaro-zepbound-weight-loss-drugs-d7060ef2?gaa (last visited Aug. 31, 2026).

123. Eli Lilly has integrated with numerous other telehealth companies like Noom to provide their weight loss medications to consumers.[101]

## V. The Marketing Engine: Billions Spent to Generate Millions of Prescriptions and Billions of Sales

### A. Novo Nordisk: The Semaglutide Promotional Juggernaut

124. As a result of Novo Nordisk's all-encompassing advertising and promotion efforts, Ozempic is widely prescribed throughout the United States.

125. In July of 2021, doctors in the United States wrote 62,000 prescriptions a week for Ozempic.[102]

126. It has been reported that the huge demand created by extensive marketing has led to rampant off-label usage and "gaming" the system to allow for insurance coverage.[103]

127. In June 2023, it was reported that new prescriptions for Ozempic had surged by 140% from the prior year.[104]

128. This surge has reshaped Denmark's economy as the country has reaped huge profits from the sale of the drug, which is now solely responsible for the country's economic growth.[105]

129. Ozempic has become so popular that at one point in 2023, Novo Nordisk limited shipment to the United States and paused advertising while it addressed shortages.[106]

---

[101] https://www.noom.com/in-the-news/noom-to-streamline-access-to-zepbound-vials-with-noom-glp-1-companion-through-integration-with-lillydirect-pharmacy-provider/?srsltid=AfmBOopZtRpDqDtHAkAvdIhz2i5v-GhSGkaLJWMWQuDZCDL-Jy-VNnNh (last visited Aug. 31, 2026).
[102] https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy.html (last visited Aug. 28, 2026).
[103] *Id.*
[104] https://www.washingtonpost.com/business/2023/06/11/weight-loss-ozempic-wegovy-insurance/ (last visited Aug. 28, 2026).
[105] https://www.nytimes.com/2023/08/28/business/denmark-ozempic-wegovy.html?action=click&pgtype=Article&state=default&module=styln-weight-loss-drugs&variant=show&region=MAIN_CONTENT_1&block=storyline_top_links_recirc (last visited Aug. 29, 2026).
[106] https://www.theatlantic.com/health/archive/2023/05/ozempic-teen-obesity-treatment-health-promises-risks/674204/ (last visited Aug. 29, 2026).

130. As of August 10, 2023, Novo Nordisk reported that in the first six months of 2023 sales of Ozempic jumped 50% to more than $3.7 billion.[107]

131. In 2025, global net sales for Ozempic reached approximately $19.9 billion according to the Novo Nordisk Annual Report 2025.[108]

### B. Eli Lilly: Challenging the Market with Aggressive Tirzepatide Campaigns

132. As a result of Defendant Eli Lilly's all-encompassing advertising and promotion efforts, Mounjaro and Zepbound are widely prescribed throughout the United States.

133. Millions of Americans have been prescribed Mounjaro since its 2022 FDA approval, though exact prescription rates or current user numbers are unavailable due to discontinuations and access barriers.[109]

134. By 2023, the rate of Mounjaro prescribing had increased by 0.4% from the previous year and by 2024 it increased by 0.8%.[110]

135. By 2023, semaglutide and Mounjaro made up 70% of all spending done by Americans on GLP-1 RAs.[111]

136. Following the approval of Zepbound, tirzepatide prescriptions increased from 1.1 million to 1.4 million monthly prescriptions by February 2024.[112]

137. During December 2024, overall prescribing rates of anti-obesity medication was highest for tirzepatide.[113]

---

[107] https://www.cnbc.com/2023/09/09/big-pharma-blockbuster-obesity-drug-battle-is-headed-for-100-billion.html#:~:text=Novo%20traded%20earnings%20jabs%20with,to%20more%20than%20%243.7%20billion (last visited Aug. 29, 2026).
[108] https://annualreport.novonordisk.com/2025/strategic-aspirations/financial-performance.html (last visited Aug. 29, 2026).
[109] https://www.fellahealth.com/guide/how-many-people-are-on-tirzepatide#:~:text=11 (last visited Aug. 31, 2026)
[110] https://www.truveta.com/blog/research/glp1-prescription-trends-december-2024#:~:text=%2C%20or%20unknown).- (last visited Aug. 31, 2026).
[111] https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2832114 (last visited Aug. 31, 2026).
[112] https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2829700 (last visited Aug. 29, 2026).
[113] https://www.medrxiv.org/content/10.1101/2025.03.06.25323524v1 (last visited Aug. 29, 2026).

138. A 2024 study estimated that Mounjaro's use grew by more than 250% each month in its first year of release, despite only being available for seven out of 12 months that year.[114]

139. Just three years post-launch, Mounjaro reached an average of 9 patients per provider.[115]

140. Since 2022, the number of providers prescribing Mounjaro and the ratio of prescribed patients to prescribers has been increasing steadily.[116]

## VI. Defendants Have Long Known That Ozempic, Wegovy, Mounjaro and Zepbound are Powerful Dangerous Drugs

141. As detailed below, Defendants knew from both pre-market and post-market research and analytics that these GLP-1 receptor agonist medications could cause malnutrition, cyclical vomiting, gastroparesis (stomach paralysis), gastroenteritis, intestinal obstruction/blockage, ileus, esophageal and bowel injury, DVT and associated pulmonary embolism, gallbladder problems necessitating surgery, intraoperative aspiration, and non-arteritic anterior ischemic optic neuropathy (NAION).

142. Novo Nordisk and Eli Lilly have repeatedly failed to warn about the known dangerous side effects of their respective formulations. This includes malnutrition, cyclical vomiting, gastroparesis, gastroenteritis, intestinal obstruction/blockage, ileus, esophageal and bowel injury, DVT and associated embolism, gallbladder problems necessitating surgery, intraoperative aspiration, and permanent vision loss from NAION. All of these conditions can, and have, led to hospitalization and/or death in patients across the United States.

[114] https://www.singlecare.com/blog/news/mounjaro-statistics-2025/ (last visited Aug. 29, 2026).
[115] https://www.iqvia.com/locations/united-states/blogs/2025/09/obesity-deep-dive-the-unparalleled-launch-success-of-mounjaro-and-zepbound
[116] *Id.*

143. Some doctors estimate that as many as 10% of patients discontinue use of these drugs due to the severity of side effects.[117]

144. Thousands of adverse event reports have been filed by the public with the FDA Adverse Event Reporting System (FAERS).

145. As of June 2022, the FDA had posted an alert that semaglutide medications possessed potential safety signals for intestinal blockage.[118]

146. While Eli Lilly's Mounjaro carried a warning regarding gastrointestinal disorders and delayed gastric emptying, its initial label downplayed the severity of life-threatening intestinal obstructions. On September 22, 2023, the FDA updated the label for Ozempic to include "ileus," the medical term for blocked intestines, catching up to warnings already detailed on Eli Lilly's Mounjaro label.[119]

147. Wegovy, chemically identical to Ozempic, already carried a warning on ileus. Similarly, Eli Lilly's weight-loss formulation, Zepbound, launched with an awareness of these severe class-wide gastrointestinal paralysis risks.

148. As early as 2014, Defendant Novo Nordisk knew that Saxenda (liraglutide), Ozempic's predecessor, caused serious side effects and warned the end user of the same.[120]

149. As early as 2019, Defendant Novo Nordisk knew that Rybelsus (semaglutide), Ozempic's predecessor, caused serious side effects and warned the end user of the same.[121]

---

[117] https://www.cbsnews.com/news/ozempic-side-effects-weight-loss-drugs-wegovy-mounjaro-doctors-warn/ (last visited Aug. 29, 2026).

[118] https://www.fda.gov/drugs/fda-adverse-event-monitoring-system-aems/april-june-2022-new-safety-information-or-potential-signals-serious-risks-identified-fda-adverse (last visited Aug. 29, 2026).

[119] https://www.healthline.com/health-news/fda-updates-ozempic-label-to-include-blocked-intestines-as-potential-side-effect#:~:text=Ozempic%20Label%20Updated%20to%20Include%20Blocked%20Intestines%20 (last visited August 29, 2026).

[120] https://www.accessdata.fda.gov/drugsatfda_docs/label/2014/206321orig1s000lbl.pdf (last visited Aug. 29, 2026).

[121] FDA, *NDA Approval Letter for Rybelsus (semaglutide) tablets*, Application No. NDA 213051 (Sept. 20, 2019).

150. Defendant Eli Lilly similarly possessed early, foundational knowledge of severe gastrointestinal risk through its own predecessor GLP-1 formulations, such as Trulicity (dulaglutide), yet rushed Mounjaro and Zepbound to market without adequate, prominent warnings regarding long-term gastric paralysis and ischemic optic nerve injury.[122]

## VII. GLP-1 Receptor Agonists and NAION: The Link Between Ozempic, Wegovy, Mounjaro, Zepbound, and Permanent Vision Loss

151. Non-arteritic Anterior Ischemic Optic Neuropathy (NAION) is a severe, permanent, and irreversible medical condition characterized by rapid damage to the human optic nerve, culminating in localized or total loss of sight.[123]

152. Within the medical and scientific communities, NAION is categorized and referred to as an "eye stroke."[124]

153. NAION is a fundamentally untreatable condition that frequently produces permanent blindness.[125]

---

[122] *See Trulicity (dulaglutide) Injection, Full Prescribing Information*, Eli Lilly & Co. § 5.6 (Sept. 2014), fda.gov (noting that use "may be associated with gastrointestinal adverse reactions, sometimes severe" and that it "has not been studied in patients with severe gastrointestinal disease, including severe gastroparesis")

[123] *See* American Academy of Ophthalmology, *Non-Arteritic Anterior Ischemic Optic Neuropathy (NAION)*, EyeWiki, https://eyewiki.org/Non-Arteritic_Anterior_Ischemic_Optic_Neuropathy_(NAION) (last updated Aug. 10, 2026) (defining NAION as a non-inflammatory optic neuropathy characterized by acute, permanent vision loss and structural nerve damage). *See also* North American Neuro-Ophthalmology Society (NANOS), *Non-Arteritic Anterior Ischemic Optic Neuropathy*, https://www.nanosweb.org/NAION/ (last visited Aug. 29, 2026) (stating that reduced blood supply "damages the front part of the optic nerve, causing it to swell and resulting in vision loss... leaving behind permanent changes to the optic nerve and to your vision").

[124] *See* UC Davis Health, *New Risk Factor Identified for Potentially Blinding Condition* (June 2023), ucdavis.edu ("Nonarteritic Anterior Ischemic Optic Neuropathy (NAION) is a relatively rare condition in which a loss of blood flow and oxygen delivery to the optic nerve cause sudden and painless vision loss in one eye. It is sometimes referred to as an eye stroke.")

[125] *See* Cleveland Clinic, *Ischemic Optic Neuropathy: Management and Treatment*, clevelandclinic.org (last reviewed August 29, 2026) (stating that "[t]here's no treatment or cure for ischemic optic neuropathy" and that "[b]ecause your eye tissue doesn't grow back, your vision loss is permanent").

154. While the precise cause of NAION is unknown, the general belief amongst the medical community is that the condition is caused by insufficient blood supply or ischemia to the optic nerve.[126]

155. The underlying pathophysiological mechanism of NAION is systemic microvascular hypoperfusion.[127]

156. "[T]ransient hypoperfusion of the short posterior ciliary arteries causes acute ischemia to the optic nerve head (ONH), resulting in axonal swelling. This axonal swelling compromises the axoplasmic flow, which subsequently increases the axonal swelling, contributing to the compression of ONH microcirculation, exacerbating the ischemia."[128]

157. Anterior ischemic optic neuropathy (AION) involves the 1mm segment of the optic nerve head, also known as the optic disc, and results in visible disc swelling.[129]

158. Typically, NAION patients present with acute, painless vision loss in one eye that is often described as blurry or cloudy white and 8-12% of patients may have accompanying pain such as a headache or periocular pain.[130]

159. The vision loss may occur over hours to days, but generally NAION patients notice vision loss or even total blindness upon waking in the morning.[131]

---

[126] *See* StatPearls [Internet], *Nonarteritic Anterior Ischemic Optic Neuropathy*, National Center for Biotechnology Information (NCBI) (2024), nih.gov ("Although the exact pathogenesis of NAION has not been elucidated, the prevailing theory is that it is caused by hypoperfusion of the short posterior ciliary arteries supplying the optic nerve, which then causes ischemia...").
[127] *Id.*
[128] https://www.aao.org/eyenet/article/naion-diagnosis-and-management (last visited August 29, 2026).
[129] *See* American Academy of Ophthalmology, *Non-Arteritic Anterior Ischemic Optic Neuropathy (NAION)*, EyeWiki, https://eyewiki.org/Non-Arteritic_Anterior_Ischemic_Optic_Neuropathy_(NAION) (last updated Aug. 10, 2026).
[130] *Id.*
[131] *Id.*

160. After glaucoma, NAION is the second most common cause of blindness due to optic nerve damage.[132]

161. Some NAION patients lose complete vision with no recovery in affected eye(s).[133]

162. About 15% of patients who have NAION in one eye eventually develop it in their other eye.[134]

163. Patients with NAION suffer from blurred or darkened vision obstructing their field of view, as well as loss of color vision and loss of contrast in vision.[135]

164. Reduced or loss of vision has a detrimental impact on a person's day-to-day life. Many NAION patients cannot drive or have driving restrictions, cannot read or have trouble reading, and may be unable to continue in their line of employment. Being blind in one eye, and certainly both eyes, results in bumps and falls and injuries related to the unseen impacts and accidents.[136]

---

[132] R. Miller, *Current concepts in the diagnosis, pathogenesis and management of nonarteritic anterior ischemic optic neuropathy*, Eye (Lond). 2015;29(1):65-79, available at https://pmc.ncbi.nlm.nih.gov/articles/PMC4289822/ (stating that NAION is "the second most common cause of permanent optic nerve-related visual loss in adults after glaucoma").

[133] *See* Ischemic Optic Neuropathy Decompression Trial Research Group, *Characteristics of Patients with Nonarteritic Anterior Ischemic Optic Neuropathy*, 114 Arch. Ophthalmol. 1137 (1996) (finding that acute NAION visual acuity levels frequently drop as low as "light perception only" depending on the specific zone of tissue infarction, with a substantial percentage of affected eyes experiencing zero subsequent visual recovery).

[134] *Id.*

[135] *Ischemic Optic Neuropathy,* Cleveland Clinic, available at https://my.clevelandclinic.org/health/diseases/ischemic-optic-neuropathy (last visited Aug. 29, 2026).

[136] *See* StatPearls [Internet], *Nonarteritic Anterior Ischemic Optic Neuropathy: Complications*, National Center for Biotechnology Information (NCBI) (2024), https://www.ncbi.nlm.nih.gov/books/NBK559045/ ("NAION significantly impacts daily functioning and quality of life, especially in individuals who lose vision in both eyes. Visual field defects and reduced contrast sensitivity impair activities, such as driving, reading, and work performance."). *See also, e.g.*, The Challenge of Managing NAION, *Retina Specialist* (2017), https://www.retina-specialist.com/article/the-challenge-of-managing-naion (discussing how sudden nerve-fiber-layer type defects and altitudinal vision loss drastically reduce depth perception and peripheral awareness, precipitating mobility restrictions, employment displacement, and heightened risks of accidental physical trauma).

165. Defendants knew or should have known of the causal association between the use of Ozempic, Wegovy, Mounjaro, and/or Zepbound and the risk of developing NAION and its sequelae, but they ignored it.

166. GLP-1 RAs are treated as an established pharmacologic class (EPC) by the FDA and the class of drugs shares a similar mechanism of action, similar physiologic effects, and similar structure.[137]

167. It has been known since at least 2016 that the human eye contains GLP-1 receptors.[138]

168. GLP-1 receptors have been detected particularly in neuronal cells in the human eye.[139]

169. Scientists hypothesize that expression of the GLP-1 receptor in the optic nerve and GLP-1 RA–induced enhanced sympathetic nervous system activity might influence optic nerve head perfusion and potentially increase the risk of NAION.[140]

170. Defendants conduct clinical trials and have access to case reports and medical literature that provide them with superior knowledge compared to the general public as to potential risks of its medications.

---

[137] U.S. Food & Drug Administration, *FDA Listing of Established Pharmacologic Class (EPC) Text Phrases* 3 (2024), https://www.fda.gov/media/177252/download (officially designating active moieties including semaglutide, tirzepatide, and dulaglutide under the unified EPC designation of "glucagon-like peptide-1 (GLP-1) receptor agonist").

[138] Hernández, C, et al, Topical administration of GLP-1 receptor agonists prevents retinal neurodegeneration in experimental diabetes. *Diabetes* 65, no. 1 (2016): 172-87. Doi: 10.2337/db15-0443. Epub 2015 Sep 17. PMID: 26384381.

[139] Hebsgaard JB, et al., *Glucagon-like peptide-1 receptor expression in the human eye*, Diabetes Obes Metab. 2018; 20(9): 2304-2308.

[140] Hathaway JT, et al., *Risk of Nonarteritic Anterior Ischemic Optic Neuropathy in Patients Prescribed Semaglutide*, JAMA Ophthalmol. 2024;142(8):732–739.

171. The FDA's Adverse Events Reporting System (FAERS) (now the Adverse Event Monitoring System) shows multiple reports of "Optic Ischemic Neuropathy" reported in connection with the use of GLP-1 RAs.[141]

172. The earliest reported Optic Ischemic Neuropathy event associated with any GLP-1 RA occurred in 2012, and the earliest associated with semaglutide specifically was in 2019.[142]

173. A meta-analysis of all clinical trials of GLP-1 RA drugs, including Novo Nordisk's own clinical trials, found a non-statistically significant increased risk of optic ischemic neuropathy.[143]

174. The authors note that optic ischemic neuropathy is rare and may have been underreported in clinical trials, leading to an inaccurate, lower estimated risk.[144]

175. The overall rate of optic ischemic neuropathy was higher in the treatment group than the control group: 5.6 and 3.0 cases per 100,000 patient-years, respectively. The authors also note that "inappropriate use of drugs for inducing weight loss in moderately overweight patients with low cardiovascular risk could be associated with rare, but severe, adverse effects, possibly including NAION.[145]

176. A Novo Nordisk spokesperson acknowledged that cases of NAION, which leads to severe and irreversible vision loss, were identified in Novo Nordisk's clinical trials.[146]

---

[141] The FAERS database (now the Adverse Event Monitoring System (AEMS)) is accessible online at https://www.fda.gov/drugs/fda-adverse-event-monitoring-system-aems/fda-adverse-event-monitoring-system-aems-public-dashboard

[142] The FAERS database (now the Adverse Event Monitoring System (AEMS)) is accessible online at https://www.fda.gov/drugs/fda-adverse-event-monitoring-system-aems/fda-adverse-event-monitoring-system-aems-public-dashboard.

[143] Silverii GA et al, Glucagon-like peptide 1 (GLP1) receptor agonists and risk for ischemic optic neuropathy. A meta-analysis of randomised controlled trials, Diabetes Obes Metab, 2024 (available as a pre-print manuscript as of Nov. 20, 2024), https://dom-pubs.pericles-prod.literatumonline.com/doi/10.1111/dom.16076.

[144] *Id.*

[145] *Id.*

[146] Kevin Dunleavey, After studies flag possible link between Novo's Ozempic and rare eye

177. For example, a clinical trial entitled "A Research Study to Compare Two Doses of Semaglutide Taken Once Weekly in People with Type 2 Diabetes (SUSTAIN FORTE)" with results first submitted in August 2021, involved a participant who developed optic ischemic neuropathy which was categorized as a serious adverse event.[147]

178. The event occurred within the semaglutide 2.0 mg dosage group, which included 479 participants, which is significant given the low background incidence of NAION.[148]

179. Clinical observations by astute neuro-ophthalmologists at the Harvard affiliated Massachusetts Eye and Ear ("Mass Eye and Ear") noted a surge of NAION cases amongst patients on Ozempic. This led them to conduct a retrospective, matched cohort study of neuro-ophthalmic patients, authored by Hathaway, et al.[149]

180. The Hathaway study, "Risk of Nonarteric Anterior Ischemic Optic Neuropathy in Patients Prescribed Semaglutide," involved patients examined in the neuro-ophthalmology clinic between December 1, 2017, and November 30, 2023, consisting of 17,298 patients, including 701 with type 2 diabetes (T2D) and 979 who were overweight or obese. Within the T2D study population, NAION occurred in 17 patients in the semaglutide cohort vs. 6 in the non-GLP-1 RA cohort, showing a higher NAION risk in the semaglutide cohort (HR, 4.28; 95% CI, 1.62-11.29; $P < .001$).[150]

---

disorder, Danish agency calls for probe, Fierce Pharma, (Dec. 17, 2024), available at https://www.fiercepharma.com/pharma/novo-nordisk-faces-new-reports-suggesting-link-between-ozempic-and-blindness (last visited Aug 29, 2026); *see also* Naomi Kresge, Ozempic Link to Rare Vision Loss Risk Confirmed in Study, Bloomberg, (Dec. 13, 2024), available at https://www.bloomberg.com/news/articles/2024-12-13/ozempic-link-to-rare-vision-loss-risk-confirmed-in-large-trial?leadSource=uverify%20wall (last visited Aug. 29, 2026).

[147] A Research Study to Compare Two Doses of Semaglutide Taken Once Weekly in People With Type 2 Diabetes (SUSTAIN FORTE). ClinicalTrials.gov identifier: NCT03989232. Updated February 13, 2023. (last visited Aug. 29, 2026).

[148] *Id.*

[149] Hathaway JT, Shah MP, Hathaway DB, et al. Risk of Nonarteritic Anterior Ischemic Optic Neuropathy in Patients Prescribed Semaglutide. JAMA Ophthalmol. 2024;142(8):732–739. doi:10.1001/jamaophthalmol.2024.2296.

[150] *Id.*

181. Within the T2D study population, NAION occurred in 17 patients in the semaglutide cohort vs. 6 in the non-GLP-1 RA cohort, showing a higher NAION risk in the semaglutide cohort (HR 4.28; 95% CI, 1.62-11.29; P < .001).[151]

182. Within the overweight/obese cohort, NAION occurred in 20 patients in the semaglutide cohort vs. 3 in the non-GLP-1 RA cohort, showing a higher NAION risk in the semaglutide cohort (HR, 7.64; 95% CI, 2.21-26.36; P < .001).[152]

183. The study revealed a "substantially increased risk of NAION among individuals prescribed semaglutide relative to those prescribed other medications to treat T2D and obesity or overweight."[153]

184. A registry-based prospective cohort study identifying 424,152 patients diagnosed with type 2 diabetes in Denmark between December 1, 2018, and December 31, 2023, concluded that exposure to once-weekly semaglutide more than doubles the risk of NAION. Furthermore, after the introduction of once-weekly semaglutide in Denmark in November 2018, the annual number of first-time NAION episodes reached an all-time high for the years 2019-2023.[154]

185. Interestingly, the study also observed that "after the introduction of once-weekly semaglutide in Denmark in November 2018, the annual number of first-time NAION episodes reached an all-time high for the years 2019-2023."[155]

---

[151] *Id.*
[152] *Id.*
[153] *Id.*
[154] Grauslund J, Taha AA, Molander LD, et al, Once-weekly semaglutide doubles the five-year risk of nonarteritic anterior ischemic optic neuropathy in a Danish cohort of 424,152 persons with type 2 diabetes. *Intl. Journal of Retina and Vitreous*. 2024;10(1):97. doi:10.1186/s40942-024-00620-x.
[155] *Id.*

186. On December 11, 2024, a cohort study out of Denmark and Norway similarly found an association between the use of semaglutide for type 2 diabetes and the risk of NAION, concluding there is a more than two-fold increased hazard ratio.[156]

187. Due to these findings, as of January 17, 2025, the Pharmacovigilance Risk Assessment Committee (PRAC) of the Danish Medicines Agency required Novo Nordisk to review and submit available data related to semaglutide and NAION.[157]

188. In response, Novo Nordisk acknowledged cases of NAION, which leads to severe and irreversible vision loss, were identified within their clinical trials.[158]

189. A case series published by Katz et al., "Ophthalmic Complications Associated With the Antidiabetic Drugs Semaglutide and Tirzepatide," examined nine patients taking GLP-1 RA medications who experienced ophthalmologic complications, seven of whom developed NAION. [159] This included a report of a woman with type 2 diabetes taking semaglutide with evidence of positive challenge and rechallenge.[160]

190. The morning after her first injection of semaglutide, she experienced vision loss in her left eye, discontinued the medication, and then experienced vision loss in her right eye consistent with NAION two months later after starting the drug again.[161]

---

[156] Simonsen E, Lund LC, Ernst MT, et al. Use of semaglutide and risk of non-arteritic anterior ischemic optic neuropathy: A Danish–Norwegian cohort study. Published online Dec. 11,2024. doi:10.1101/2024.12.09.24318574.
[157] https://laegemiddelstyrelsen.dk/en/news/2024/suspicion-of-rare-eye-condition-from-ozempic-use-to-be-investigated-further/ (last visited Aug. 29, 2026).
[158] 72 Kevin Dunleavey, After studies flag possible link between Novo's Ozempic and rare eye disorder, Danish agency calls for probe, Fierce Pharma, (Dec. 17, 2024), available at https://www.fiercepharma.com/pharma/novo-nordisk-faces-new-reports-suggesting-link-between-ozempic-and-blindness (last visited Aug. 28, 2026); *see also* Naomi Kresge, Ozempic Link to Rare Vision Loss Risk Confirmed in Study, Bloomberg, (Dec. 13, 2024), available at https://www.bloomberg.com/news/articles/2024-12-13/ozempic-link-to-rare-vision-loss-risk-confirmed-in-large-trial?leadSource=uverify%20wall (last visited Aug. 28, 2026).
[159] Katz BJ, Lee MS, Lincoff NS, et al, Ophthalmic Complications Associated With the Antidiabetic Drugs Semaglutide and Tirzepatide. *JAMA Ophthalmol*. Published online Jan. 30, 2025. doi:10.1001/jamaophthalmol.2024.6058.
[160] *Id.*
[161] *Id.*

191. The same Katz et al. article included reports of three patients who developed NAION following tirzepatide use. The first case involved a man in his sixties reporting a painless shade in the superior field of his left eye after using tirzepatide injections for a year.[162]

192. The second case involved a man in his sixties who experienced painless vision loss upon awakening four months after his weekly dose was increased to 10 mg of tirzepatide. The third case involved a woman in her fifties who experienced painless vision loss upon awakening five months after she started tirzepatide.[163]

193. A study published on April 7, 2025, analyzing FDA Adverse Event reports indicates increased reports of vision impairment linked to semaglutide use, showing "significantly higher" reports compared to other diabetes and weight loss medications.[164]

194. On August 11, 2025, a cohort study published in JAMA Ophthalmology by Wang et al. evaluated 159,398 patients with Type 2 diabetes to determine if using semaglutide or tirzepatide was associated with an increased risk of NAION.[165] At the two-year follow-up, 35 patients (0.04%) taking semaglutide or tirzepatide developed NAION compared to 19 patients (0.02%) in the comparison group, concluding that treatment was associated with an increased risk of optic nerve disorders, including NAION.[166]

195. The medical community is continuing to study whether the use of GLP-1 RA medications carries a heightened risk of NAION. As stated by the FDA, "[g]iven the severe and irreversible nature of NAION and the growing popularity of GLP-1 RA, we aim to evaluate the

---

[162] *Id.*
[163] *Id.*
[164] Massy, et al. Increased vision impairment reports linked to semaglutide: analysis of FDA adverse event data, BMC Medicine (2025) 23:203, available at https://bmcmedicine.biomedcentral.com/articles/10.1186/s12916-025-04031-z.
[165] Wang L, et al., *Semaglutide or Tirzepatide and Optic Nerve and Visual Pathway Disorders in Type 2 Diabetes*, JAMA Ophthalmol. Published online August 11, 2025. doi:10.1001/jamanetworkopen.2025.26327.
[166] *Id.*

previously observed safety signal with respect to NAION," and the agency has commissioned an ongoing study analyzing insurance claims data from the FDA Sentinel System, which includes patients exposed to Mounjaro and Ozempic.[167]

196. Rather than conducting extensive post-marketing surveillance or alerting the medical community to these neuro-ophthalmological risks, Defendants executed aggressive, multi-million-dollar direct-to-consumer advertising campaigns to capture massive market share. In July 2018, Novo Nordisk launched its nationwide television promotional campaign for Ozempic, prominently featuring a modification of the 1970s pop hit song "Magic" by Pilot.[168]

197. These advertisements aggressively highlighted that adults utilizing the medication lost an average of up to 14 pounds, deliberately driving consumer demand while omitting eye stroke risks.[169]

198. Defendant Eli Lilly similarly utilized aggressive marketing avenues to drive immediate consumer uptake, launching its multi-million dollar nationwide "What If?" television commercial campaign for Mounjaro in early 2023, which immediately vaulted into the top national pharmaceutical advertising spenders list. Lilly reinforced this commercial blitz in late 2024 with its "Change" promotional campaign for Zepbound and high-profile television

[167] *See Food and Drug Administration Sentinel Initiative, Risk of Non-Arteritic Anterior Ischemic Optic Neuropathy (NAION) Following GLP-1 Receptor Agonist Use in Patients with Type 2 Diabetes Mellitus* v3.0, 1–4 (last visited Aug. 28, 2026), sentinelinitiative.org (evaluating real-world insurance claims data across the FDA Sentinel System's Commercial Network for patients exposed to GLP-1RA formulations indicated for Type 2 Diabetes, including both once-weekly semaglutide and tirzepatide).
[168] *See With diabetes competitive as ever, Novo launches Ozempic DTC campaign*, BioPharma Dive (Aug. 1, 2018), https://www.biopharmadive.com/news/with-diabetes-competitive-as-ever-novo-launches-ozempic-dtc-campaign/529145/ (reporting the television spot premiered nationally on July 30, 2018, accumulating over 120 national broadcasts within its opening days and commanding an initial expenditure approaching $1,000,000).
[169] *See* Novo Nordisk Inc**.**, *Ozempic TV Spot, 'Magic: 14 Pounds'*, iSpot.tv (Aug. 2018), ispot.tv (capturing the national broadcast video where the on-screen graphics and voiceover explicitly message to consumers that adults utilizing the medication achieved an average weight loss of up to 14 pounds).

broadcasts designed to aggressively expand its consumer base while failing to warn of ischemic ophthalmic dangers.[170]

199. Throughout this sustained commercial promotion, Defendants actively concealed internal clinical data showing microvascular ocular danger, downplayed the systemic risks of the drug, and failed to provide any instructions advising pre-treatment baseline visual examinations or routine ongoing eye monitoring to ensure safe use.[171]

200. Despite the growing number of articles, reports, and investigations, Defendants still provide no warnings about the dangerous side effect of NAION. No version of the United States Ozempic, Wegovy, Mounjaro, or Zepbound product labels has ever warned patients, consumers, or prescribing physicians that semaglutide or tirzepatide exposure can cause NAION, induce mechanical optic nerve ischemia, or trigger permanent vision loss.[172]

---

[170] *See* Eli Lilly Spends Big on First Mounjaro TV Commercial for Diabetes, Xtalks (Mar. 2023), xtalks.com (documenting the official premiere of the "What If?" television spot following supply chain updates and outlining the multi-million dollar launch budget); *see also* Top Pharma Ad Spenders in August 2023, Xtalks (Sept. 2023), https://xtalks.com/top-pharma-ad-spenders-in-august-2023-abbvie-splurges-to-take-top-spots-3547/ (confirming that Mounjaro's flagship "What If" commercial campaign and subsequent spots elevated Lilly into the top tier of national pharmaceutical advertisers alongside class competitors like Ozempic).

[171] *See* Novo Nordisk Inc., *Ozempic (semaglutide) Injection: Full Prescribing Information*, § 2, 5 (2026) (failing to provide any instructions advising clinicians or patients to obtain pre-treatment baseline visual examinations or to perform routine ongoing eye monitoring to mitigate microvascular ocular risks); *see also* Eli Lilly & Co**.**, *Mounjaro (tirzepatide) Injection: Full Prescribing Information*, § 2, 5 (2026) (completely omitting any clinical guidelines or directives regarding routine ophthalmic screening or visual field monitoring prior to or during treatment).

[172] *See* Novo Nordisk Inc., *Ozempic (semaglutide) Injection: Full Prescribing Information*, § 5 (Warnings and Precautions) (2026), https://www.accessdata.fda.gov/drugsatfda_docs/label/2025/209637s025lbl.pdf (containing warnings for thyroid tumors, pancreatitis, hypoglycemia, acute kidney injury, hypersensitivity, and diabetic retinopathy, but completely omitting any disclosure regarding NAION or ischemic optic neuropathy); *see also* Novo Nordisk Inc., *Wegovy (semaglutide) Injection: Full Prescribing Information*, § 5 (Warnings and Precautions) (2026), fda.gov (lacking any warning or precautionary text regarding structural optic nerve damage or eye strokes). *See* Eli Lilly & Co., *Mounjaro (tirzepatide) Injection: Full Prescribing Information*, § 5 (Warnings and Precautions) (2026), https://www.accessdata.fda.gov/drugsatfda_docs/label/2026/215866s041lbl.pdf (omitting any mention of ischemic optic nerve conditions or permanent blindness within the mandated safety profile); *see also* Eli Lilly & Co**.**, *Zepbound (tirzepatide) Injection: Full Prescribing Information*, § 5 (Warnings and Precautions) (2026), https://www.accessdata.fda.gov/drugsatfda_docs/label/2026/217806s002lbl.pdf (confirming that the product warning architecture does not notify consumers or physicians of the risk of permanent vision loss from NAION).

### VIII. Defendants' Continuing Failure to Disclose the Risk of NAION and its Sequela

201. According to the Drugs@FDA website, the label for Ozempic has been updated on at least thirteen (13) occasions since 2017, with the most recent update on January 28, 2025.[173] Despite the fact there are at least fourteen (14) iterations of the Ozempic label, Novo Nordisk's labeling contains no warning or any information whatsoever regarding an increased propensity of Ozempic to cause NAION or permanent vision loss as suffered by Plaintiff.[174]

202. Similarly, the product label for Wegovy has been updated on at least nine (9) occasions since 2021, with a recent update on November 27, 2024.[175] Despite the ten (10) iterations of the Wegovy label, it remains completely devoid of any warning or structural risk disclosure concerning semaglutide-induced NAION or blindness.[176]

203. Defendant Eli Lilly has engaged in the same pattern of omission. The product label for Mounjaro has been updated on at least twelve (12) different occasions since 2022, with a recent update on September 25, 2025.[177] None of these iterations contain any warning or data regarding the drug's propensity to induce mechanical optic nerve ischemia or vision loss.[178]

204. Furthermore, the product label for Zepbound has been updated on at least twenty-one (21) different occasions since 2023, with a recent update on February 25, 2026.[179]

---

[173] *See* Drugs@FDA: FDA-Approved Drugs, Ozempic, Application No. 209637, fda.gov, https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=209637 (last visited Aug. 29, 2026).
[174] *Id.*
[175] *See* Drugs@FDA: FDA-Approved Drugs, Wegovy, Application No. 215256, fda.gov, https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=215256 (last visited Aug. 29, 2026).
[176] *Id.*
[177] *See* Drugs@FDA: FDA-Approved Drugs, Mounjaro, Application No. 215866, fda.gov, https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=215866 (last visited Aug. 29, 2026).
[178] *Id.*
[179] *See* Drugs@FDA: FDA-Approved Drugs, Zepbound, Application No. 217806, fda.gov, https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=217806https://www.a

Despite these frequent revisions, Eli Lilly's labeling remains entirely silent on the risk of permanent blindness from NAION.[180]

205. This systemic failure to warn persists despite clear mandates from international regulatory bodies. On June 6, 2025, the European Medicines Agency (EMA) officially recommended that the product information for all semaglutide medicines—including Ozempic, Wegovy, and Rybelsus—explicitly include NAION as an adverse side effect.[181] To date, Defendants' United States labels remain completely devoid of this recommended warning.[182]

206. Both Novo Nordisk and Eli Lilly have failed to take any alternative steps to warn the medical community, particularly physicians within the ophthalmologic and neuro-ophthalmologic specialties. Defendants provide no marketing or medical circulars encouraging a baseline eye examination prior to starting Ozempic, Wegovy, Mounjaro, or Zepbound. They provide no instructions for regular vision monitoring during treatment, and no warnings advising patients to immediately cease medication use if they develop symptoms consistent with an eye stroke to avoid risking permanent injury to the contralateral eye.[183]

---

ccessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=217806 (last visited Aug. 29, 2026).

[180] *Id.*

[181] *See* European Medicines Agency, *PRAC concludes eye condition NAION is a very rare side effect of semaglutide medicines*, europa.eu, available at https://www.ema.europa.eu/en/news/prac-concludes-eye-condition-naion-very-rare-side-effect-semaglutide-medicines-ozempic-rybelsus-wegovy (last visited Aug. 29, 2026).

[182] *See* Drugs@FDA: FDA-Approved Drugs, Ozempic, Application No. 209637, fda.gov, https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=209637 (last visited Aug. 29, 2026). *See* Drugs@FDA: FDA-Approved Drugs, Wegovy, Application No. 215256, fda.gov, https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=215256 (last visited Aug. 29, 2026). *See* Drugs@FDA: FDA-Approved Drugs, Mounjaro, Application No. 215866, fda.gov, https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=215866 (last visited Aug. 29, 2026). *See* Drugs@FDA: FDA-Approved Drugs, Zepbound, Application No. 217806, fda.gov, https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=217806https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=217806 (last visited Aug. 29, 2026).

[183] *Id.*

207. Absolutely nothing prevented or prevents Defendants from adding a life-altering safety warning regarding the risk of NAION. Federal regulatory frameworks allowed both manufacturers to make "moderate changes" to their labeling at any time without awaiting prior FDA approval.[184]

208. Specifically, Defendants could have filed a "Changes Being Effected" (CBE) supplement under Section 314.70(c) of the Food, Drug, and Cosmetic Act (FDCA).[185] Regulations explicitly permit a CBE supplement to reflect "newly acquired information" to add or strengthen a contraindication, warning, precaution, or adverse reaction clause. Under 21 C.F.R. § 314.70(c)(6)(iii), updating a label to add warnings based on newly emerging scientific literature—such as the landmark studies published throughout 2025 and 2025—constitutes a permissible moderate change.[186] Any potential argument of federal impossibility preemption raised by Defendants to evade liability for this failure to warn would be misplaced under this regulatory structure.[187]

**PARTY PLAINTIFF**

209. Plaintiff DONALD H. TIPTON is a resident of LOUISIANA and is currently 81 years old.

210. In or about May 2023, Mr. Tipton was prescribed Mounjaro by Dr. Keith M. Lechtenberg. Mr. Tipton was prescribed the medication for the treatment of Type 2 Diabetes.

---

[184] *See* 21 C.F.R. § 314.70(c)(6)(iii) (permitting labeling changes to add or strengthen a warning, precaution, or adverse reaction based on newly acquired information via a Changes Being Effected supplement).
[185] *Id.*
[186] *Id.*
[187] *See* 21 C.F.R. § 340.70(c)(6)(iii). Any reliance by Defendants on an impossibility preemption defense would be legally ineffective under current controlling precedent, as the unilateral availability of the CBE mechanism defeats claims of an irreconcilable conflict between state tort law and federal labeling requirements. *See, e.g., In re Fosamax (Alendronate Sodium) Prods. Liab. Litig.*, Case No. 22-3412, D.I. 82 at 73 (3d Cir. Sept. 20, 2024) (J. Jordan) (reaffirming the plain-text operation of the CBE supplement process and explicitly noting that "the availability of a label change via a CBE supplement is problematic for [pharmaceutical companies] raising an impossibility defense").

211. Mr. Tipton filled his initial and subsequent prescriptions for Mounjaro at the Walmart Pharmacy, located in Lake Charles, Louisiana, and injected the medication weekly with the instructions provided by Defendants and his prescribing physician.

212. In or about April 2024, Mr. Tipton discontinued Mounjaro after being prescribed Ozempic by Dr. Lechtenberg.

213. Mr. Tipton filled his initial and subsequent prescriptions for Ozempic at the Walmart Pharmacy, located in Lake Charles, Louisiana, and injected the medication weekly in accordance with the instructions provided by Defendants and his prescribing physician.

214. On or about June 30, 2024, Mr. Tipton experienced a degradation of vision in his right eye. Particularly, his vision was significantly diminished and blurry.

215. On or about July 1, 2024, Mr. Tipton awoke and his vision had severely worsened, becoming absent in his right eye.

216. He sought treatment for this sudden vision loss at Lake Charles Memorial Hospital Emergency Department where diagnostic workup commenced.

217. As directed by emergency room personnel, Mr. Tipton presented to the ophthalmologist, Katherine J. Fontenot, O.D., that same day.

218. On or around July 1, 2024, there is a diagnosis of ischemic optic neuropathy with a differential including NAION, and thereafter a diagnosis of NAION.

219. On or around July 2, 2024, Mr. Tipton was admitted to Lake Charles Memorial Hospital for treatment where diagnostic workup continued.

220. Plaintiff also presented to and/or treated with ophthalmologists, Marcy L. Hanudel, M.D., Charles L. Thompson, M.D., and Lewis V. Murray, M.D., and retina specialist, Jonathan M. Perkins, M.D.

221. Mr. Tipton's eyesight loss is permanent.

222. At all times material to the above, Defendants failed to adequately warn Mr. Tipton and his medical providers of the true risks of using Defendants' Products, Mounjaro and/or Ozempic.

223. His life is forever changed because of his usage of Defendants' Products, Mounjaro and Ozempic.

224. Mr. Tipton will never see clearly again as a result of his usage of Defendants' Products.

225. Defendants knew or should have known that use of their Products could lead to severe and debilitating injuries suffered by Plaintiff and numerous other patients.

226. Defendants continue to downplay the risk of NAION and has not changed or provided any warnings to the public and medical community.

227. Defendants' Products were at all times utilized and prescribed in a manner foreseeable to Defendants.

228. Plaintiff used Defendants' Products, and did not misuse, or alter Defendants' Products in an unforeseeable manner.

229. Through their affirmative misrepresentations and omissions, Defendants actively concealed from Plaintiff and his physicians the true and significant risks associated with this medication.

230. As a result of Defendants' actions, Plaintiff and his physicians were unaware, and could not have reasonably known or learned through reasonable diligence, that Plaintiff would be exposed to the risks identified in this Complaint and that those risks were the direct and proximate result of Defendants' conduct.

231. As a direct result of being prescribed and using Defendants' Products, Plaintiff has been permanently and severely injured, having suffered serious consequences.

232. As a direct and proximate result of using Defendants' Products, Mounjaro and/or Ozempic, Plaintiff suffered severe mental and physical pain and suffering and has sustained permanent injuries and emotional distress, loss of earnings, loss of ability to earn money and other economic losses including past and future medical expenses.

233. Neither Plaintiff nor his prescribing healthcare providers knew or could have reasonably discovered through ordinary care and diligence, that using Mounjaro and/or Ozempic carried an undisclosed risk of inducing mechanical optic nerve ischemia and permanent blindness. Had Plaintiff or his physicians been provided adequate warnings regarding NAION risks, alternative treatments would have been utilized, or explicit monitoring protocols would have been enforced to prevent the injury.

234. Plaintiff diligently investigated the potential cause of these injuries, but their relationship to Mounjaro and/or Ozempic was not discovered, and through reasonable care and diligence could not have been discovered, until a date within the applicable prescriptive period for filing Plaintiff's claims.

235. Had Plaintiff and/or Plaintiff's physicians known of the true risks of NAION associated with the use of Defendants' Products, Plaintiff and/or Plaintiff's physicians would not have used the medication and would have chosen a different option for the treatment of diabetes.

236. Plaintiff's life is forever changed as a result of Defendants' actions and inactions.

## CAUSES OF ACTION

## COUNT I
## FIRST CAUSE OF ACTION
## INADEQUATE WARNING UNDER LA. R.S. 9:2800.57

237. Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

238. Mounjaro and Ozempic are products within the meaning of Louisiana products liability law.

239. Louisiana law imposes a duty on producers, manufacturers, distributors, lessors, and sellers of a product to exercise all reasonable care when producing, manufacturing, distributing, leasing, and selling their products.

240. At all relevant times, Defendants engaged in the business of designing, researching, testing, developing, manufacturing, labeling, inspecting, handling, storing, distributing, advertising, promoting, marketing, selling and/or distributing their Products and placed these drugs into the stream of commerce.

241. At all relevant times, Defendants engaged in the business of designing, researching, testing, developing, manufacturing, labeling, inspecting, handling, storing, distributing, advertising, promoting, marketing, selling and/or distributing their Products that were used by Plaintiff.

242. Defendants' Products were expected to and did reach the usual consumers, handlers, and persons coming into contact with said products without substantial change in the condition in which they were produced, manufactured, sold, distributed, and marketed by Defendants.

243. Defendants, as manufacturer, distributer, and marketer of pharmaceutical drugs, are held to the level of knowledge of experts in the field, and further, Defendants knew or should have know that warnings and other clinically relevant information and data which they distributed regarding the risks associated with the use of their Products were inadequate.

244. Plaintiff did not have the same knowledge as Defendant and no adequate warning, other clinically relevant information, or data was communicated to Plaintiff or to Plaintiff's prescribing and treating physicians.

245. Defendants had a duty to provide adequate warnings and instructions for their Products, to use reasonable care to design a product that is unreasonably dangerous to users, and to adequately understand, test, and monitor their Products.

246. Defendants marketed, promoted, distributed, and sold unreasonably dangerous and defective prescription drugs, Mounjaro and Ozempic, to health care providers empowered to prescribe and dispense Defendants' Products to consumers, including Plaintiff, without adequate warnings and other clinically relevant information and data. Through both omission and affirmative misstatements, Defendants misled and continue to mislead the medical community about the risk and benefit balance of their Products, which resulted in permanent injuries to Plaintiff.

247. Defendants knew or should have known through testing, scientific knowledge, advances in the field, or otherwise, that their Products created a risk of serious and potentially irreversible vision issues, sudden vision loss or blindness, severe optic nerve damage, and NAION in one or potentially both eyes.

248. At all relevant times, and at the times Mounjaro and/or Ozempic left Defendants' control, Defendants knew or should have known that Mounjaro and/or Ozempic were unreasonably dangerous because they did not adequately warn of the risks of NAION.

249. Despite the fact that Defendants knew or should have known that their Products caused unreasonably dangerous injuries, Defendants continued to promote, market, distribute, and/or sell Mounjaro and/or Ozempic to consumers, including Plaintiff, without adequate warnings.

250. Despite the fact that Defendants knew or should have known that Mounjaro and/or Ozempic caused unreasonably dangerous injuries, Defendants continued to market Mounjaro and/or Ozempic to prescribing physicians, including Plaintiff's prescribing physician(s), without adequate warnings.

251. Defendants knew or should have known that consumers such as Plaintiff would foreseeably and needlessly suffer injury as a result of their failure to provide adequate warnings, as set forth herein.

252. The Mounjaro and/or Ozempic supplied to Plaintiff by Defendants were defective, unreasonably dangerous, and had inadequate warnings or instructions at the time they were sold. Defendants possessed knowledge and information confirming the defective and unreasonably dangerous nature of Mounjaro and/or Ozempic but, despite this knowledge and information, Defendants failed and neglected to issue adequate warnings that Mounjaro and/or Ozempic cause serious and potentially irreversible vision issues, optic nerve damage, and NAION. Defendants have yet to issue any warnings or recommendations that patients using their Products undergo ophthalmological monitoring.

253. Defendants' failure to provide adequate warnings or instructions rendered Mounjaro and/or Ozempic unreasonably dangerous in that they failed to perform as safely as an ordinary patient, prescriber, and/or other consumer would expect when used as intended and/or in a manner reasonably foreseeable by Defendants, and in that the risk of danger outweighs the benefits.

254. Defendants continue to fail to provide adequate warnings to physicians, pharmacies, and consumers, including Plaintiff and Plaintiff's intermediary physicians.

255. Defendants failed to include adequate warnings and/or provide adequate clinically relevant information and data that would alert Plaintiff and Plaintiff's physicians to the dangerous risks of Mounjaro and/or Ozempic including, among other things, potentially irreversible vision issues such as NAION and optic nerve damage.

256. At all relevant times, given the lack of efficacy and increased safety risks, Mounjaro and/or Ozempic were not fit for the ordinary purpose for which they were intended—namely, as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus.

257. At all relevant times, given the lack of efficacy and increased safety risks, Mounjaro and/or Ozempic did not meet the reasonable expectations of an ordinary consumer, particularly Plaintiff.

258. Defendants had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promotion, advertising, packaging, sale, and/or distribution of Mounjaro and/or Ozempic into the stream of commerce, including a duty to assure their Products would not cause users to suffer unreasonable, dangerous injuries, such as NAION.

259. At all relevant times, Plaintiff was using Mounjaro and/or Ozempic for the purposes and in a manner normally intended—namely, as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus.

260. The Mounjaro and/or Ozempic designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants were defective due to inadequate warnings or instructions, as Defendants knew or should have known their Products created a risk of serious and dangerous injuries, including NAION, as well as other severe and personal injuries which are permanent and lasting in nature and Defendants failed to adequately warn of said risk.

261. The Mounjaro and/or Ozempic designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants were defective due to inadequate post-marketing surveillance and/or warnings because, after Defendants knew or should have known of the risks of serious side effects, including NAION, as well as other severe and permanent health consequences from their Products, they failed to provide adequate warnings to users and/or prescribers of the product, and continued to improperly and aggressively advertise, market, and/or promote their Products, Mounjaro and/or Ozempic.

262. Defendants had an obligation to provide Plaintiff and Plaintiff's physicians with adequate clinically relevant information and data and warnings regarding the adverse health risks associated with exposure to their Products and/or that there existed safer and/or equally effective alternative drug products that do not pose this same risk.

263. By failing to adequately test and research harms associated with Mounjaro and/or Ozempic and by failing to provide appropriate warnings and instructions about use, patients and the medical community, including prescribing doctors, were inadequately informed about the

true risk-benefit profile of Mounjaro and/or Ozempic and were not sufficiently aware that serious and potentially irreversible vision issues and optic nerve damage might be associated with use of Mounjaro and/or Ozempic. Nor were the medical community, patients, patients' families, or regulators appropriately informed that serious and potentially irreversible vision issues and optic nerve damage might be a side effect of Mounjaro and/or Ozempic and should or could be reported as an adverse event.

264. The tirzepatide and semaglutide products designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants were defective due to inadequate post-marketing surveillance and/or warnings because, even after Defendants knew or should have known of the risks of severe and permanent vision loss and optic nerve injuries from using Mounjaro and/or Ozempic, Defendants failed to provide adequate warnings to users or consumers of the products, and continued to improperly advertise, market, and/or promote their Products.

265. Mounjaro and/or Ozempic are defective and unreasonably dangerous to Plaintiff and other consumers regardless of whether Defendants had exercised all possible care in their preparation and sale.

266. The foreseeable risk of serious and potentially irreversible vision issues and harm to the optic nerve caused by Mounjaro and/or Ozempic could have been reduced or avoided by Plaintiff, prescribers, and/or other consumers had Defendants provided reasonable instructions or warnings of these foreseeable risks of harm.

267. The labels for Mounjaro and/or Ozempic were inadequate because they did not warn and/or adequately warn of all possible adverse side effects associated with the use of Mounjaro and/or Ozempic, including the increased risk of NAION.

268. The labels for Mounjaro and/or Ozempic were inadequate because they did not warn and/or adequately warn that Defendants' Products had not been sufficiently and/or adequately tested for safety risks, including NAION.

269. The labels for Mounjaro and/or Ozempic were inadequate because they did not warn and/or adequately warn of all possible adverse side effects concerning the failure and/or malfunction of Defendants' Products.

270. The labels for Mounjaro and/or Ozempic were inadequate because they did not warn and/or adequately warn of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms or severity of the side effects.

271. Communications made by Defendants to Plaintiff and his prescribing physician(s) were inadequate because Defendants failed to warn and/or adequately warn of all possible adverse side effects associated with the use of Mounjaro and/or Ozempic, including the increased risk of NAION.

272. Communications made by Defendants to Plaintiff and his prescribing physician(s) were inadequate because Defendants failed to warn and/or adequately warn that Mounjaro and/or Ozempic had not been sufficiently and/or adequately tested for safety risks, including NAION.

273. Plaintiff had no way to determine the truth behind the inadequacies of Defendants' warnings as identified herein, and his reliance upon Defendants' warnings was reasonable.

274. Plaintiff's prescribing physician(s) had no way to determine the truth behind the inadequacies of Defendants' warnings as identified herein, and his/her/their reliance upon Defendants' warnings was reasonable.

275. Upon information and belief, had Plaintiff's prescribing physician(s) been warned of the increased risk of NAION associated with Mounjaro and/or Ozempic, he/she/they would not have prescribed Mounjaro and/or Ozempic and/or would have provided Plaintiff with adequate warnings regarding the dangers of Defendants' Products so as to allow Plaintiff to make an informed decision regarding his use of Mounjaro and/or Ozempic.

276. Upon information and belief, had Plaintiff's prescribing physician(s) been warned that Mounjaro and/or Ozempic had not been sufficiently and/or adequately tested for safety risks, including NAION, he/she/they would not have prescribed Defendants' Products and/or would have provided Plaintiff with adequate warnings regarding the lack of sufficient and/or adequate testing of Defendants' Products so as to allow Plaintiff to make an informed decision regarding his use of Mounjaro and/or Ozempic.

277. Had Plaintiff been warned of the increased risk of NAION associated with Mounjaro and/or Ozempic, he would not have used Defendants' Products and/or suffered from NAION.

278. Had Plaintiff been warned that Mounjaro and/or Ozempic had not been sufficiently and/or adequately tested for safety risks, including NAION, he would not have used Defendants' Products and/or suffered NAION.

279. Had Plaintiff been warned of the increased risk of NAION associated with Mounjaro and/or Ozempic, he would have informed his prescribers that he did not want to take Defendants' Products.

280. Upon information and belief, if Plaintiff had informed his prescribing physician(s) that he did not want to use Mounjaro and/or Ozempic, his prescribing physician(s) would not have prescribed Defendants' Products.

281. By reason of the foregoing, Defendants have become liable to Plaintiff for the designing, marketing, promoting, distribution and/or selling of unreasonably dangerous products, Mounjaro and/or Ozempic.

282. Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product which created an unreasonable risk to the health of consumers and to Plaintiff in particular, and Defendants are therefore liable for the injuries sustained by Plaintiff in accordance with LA R.S. 9:2800.57.

283. Defendants' inadequate warnings of Mounjaro and/or Ozempic were acts that amount to willful, wanton, and/or reckless conduct by Defendants.

284. That said, inadequate warnings in Defendants' Products, Mounjaro and/or Ozempic was a substantial factor in causing Plaintiff's injuries.

285. As a result of the foregoing acts and omissions, Plaintiff was caused to suffer serious and dangerous injuries including NAION, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring, and/or medications, and fear of developing any of the above-named consequences, including NAION, in his sighted eye.

286. As a result of the foregoing acts and omissions Plaintiff requires and/or will require more health care and services and did incur medical, health, incidental, and related expenses. Plaintiff is informed and believes and further alleges that he will require future medical and/or hospital care, attention, and services.

287. As a direct and proximate result of Defendants' conduct, including the inadequate warnings, lack of information, lack of adequate testing and research, and the defective and

dangerous nature of Ozempic, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and aggravation of previously existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, for compensatory damages and for costs in an as yet unliquidated sum in excess of $75,000, and such other relief as this Court deems just and for a trial by jury on all issues so triable as matter of right.

**COUNT II**
**SECOND CAUSE OF ACTION**
**BREACH OF EXPRESS WARRANTY UNDER LA. R.S. 9:2800.58**

288. Plaintiff repeats, reiterates, and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

289. At all relevant times, Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, distributed, and/or have acquired the Defendants who designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed Mounjaro and/or Ozempic as hereinabove described that was placed into the stream of commerce in a defective and unreasonably dangerous condition and used by Plaintiff. These actions were under the ultimate control and supervision of Defendants.

290. Defendants, as the holder(s) of NDA, are responsible for communications to the FDA and associated regulatory authorities, reporting of adverse events, label changes, post-market surveillance, and pharmacovigilance.

291. At all relevant times, Defendants expressly warranted to Plaintiff and his prescribing physician(s) that Mounjaro and/or Ozempic were safe as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus.

292. At all relevant times, Defendants expressly warranted to Plaintiff and his prescribing physician(s) that Mounjaro and/or Ozempic were effective to use as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus.

293. At all relevant times, Defendants expressly warranted to Plaintiff and his prescribing physician(s) that the effectiveness of Mounjaro and/or Ozempic outweighed any potential dangers and/or risks.

294. The aforementioned express warranties were made to Plaintiff and Plaintiff's prescribing physician by way of Mounjaro and/or Ozempic's labels, websites, advertisements, promotional materials, and through other statements.

295. As a result of Defendants' express warranties to his prescribing physician(s), he/she/they were induced to prescribe Mounjaro and/or Ozempic to Plaintiff, and Plaintiff was induced to use Defendants' Products.

296. At all relevant times, Defendants reasonably anticipated and expected that individuals, such as Plaintiff, would use and/or consume Mounjaro and/or Ozempic based upon their express warranties.

297. At all relevant times, Defendants reasonably anticipated and expected that prescribing physicians, such as Plaintiff's prescribing physician(s), would recommend, prescribe and/or dispense Mounjaro and/or Ozempic based upon their express warranties.

298. At all relevant times, Defendants knew or should have known that Mounjaro and/or Ozempic were unreasonably dangerous because of their increased risk of severe adverse

events, including NAION, especially when the drug was used in the form and manner as provided by Defendants.

299. At all relevant times, Defendants knew or should have known that Mounjaro and/or Ozempic were unreasonably dangerous because their safety risks outweighed any efficacy the drugs may have.

300. At all relevant times, Defendants knew or should have known that Mounjaro and/or Ozempic had not been sufficiently and/or adequately tested for safety.

301. The unreasonably dangerous characteristics of Mounjaro and/or Ozempic were beyond that which would be contemplated by the ordinary user, such as Plaintiff, with the ordinary knowledge common to the public as to the drugs' characteristics.

302. The unreasonably dangerous characteristics of Mounjaro and/or Ozempic were beyond that which would be contemplated by Plaintiff's prescribing physician(s), with the ordinary knowledge common to prescribing physician as to the drugs' characteristics.

303. At the time Defendants' Products left Defendants' control, their Products did not conform to Defendants' express warranties because Mounjaro and/or Ozempic were not safe to use as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus, in that they were associated with an increased risk of severe adverse events, including NAION.

304. The express warranties made by Defendants regarding the safety and efficacy of Mounjaro and/or Ozempic were made with the intent to induce Plaintiff to use the Products and/or his prescribing physician(s) to prescribe the Products.

305. Defendants knew and/or should have known that by making the express warranties to Plaintiff and/or his prescribing physician(s) it would be the natural tendency of

Plaintiff to use Defendants' Products and/or the natural tendency of his prescribing physician(s) to prescribe Defendants' Products.

306. Plaintiff and his prescribing physician(s), as well as members of the medical community, relied on the express warranties of Defendants identified herein.

307. Had Defendants not made these express warranties, Plaintiff would not have used Defendants' Products and/or, upon information and belief, his prescribing physician(s) would not have prescribed Defendants' Products.

308. Plaintiff's injuries and damages were directly caused by Defendants' breach of the aforementioned express warranties.

309. Plaintiff's injuries and damages arose from a reasonably anticipated use of the Products by Plaintiff.

310. Accordingly, Defendants are liable as a result of their breach of express warranties to Plaintiff.

311. As a result of the foregoing breaches, Plaintiff was caused to suffer serious and dangerous injuries including NAION, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing additional health consequences.

312. By reason of the foregoing, Plaintiff has been severely and permanently injured and will require more constant and continuous medical monitoring and treatment than prior to Plaintiff's use of Defendants' Products.

313. As a result of the foregoing acts and omissions, Plaintiff requires and/or will require more health care and services and did incur medical, health, incidental, and related

expenses. Plaintiff is informed and believes and further alleges that he will require future medical and/or hospital care, attention, and services.

314. As a direct and proximate result of Defendants' conduct, including the inadequate warnings, lack of adequate testing and research, and the defective and dangerous nature of Mounjaro and/or Ozempic, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and aggravation of previously existing conditions.

315. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000.00, and such other relief as this Court deems just and for a trial by jury on all issues so triable as a matter of right.

**DAMAGES**

316. As a direct and proximate result of the unreasonably dangerous characteristics of Defendants' Products, Plaintiff sustained severe bodily injuries and resulting pain and suffering, permanent anatomical and functional vision loss, physical disability, profound mental anguish, loss of capacity for the enjoyment of life, expenses for medical and nursing care, loss of earnings, and loss of the ability to earn money. These losses are permanent and continuing in nature.

317. As a further direct and proximate result of the severe and permanent optic nerve damage caused by Defendants' Products, Plaintiff has suffered a profound limitation of personal

independence and self-sufficiency, including the permanent loss of the ability to operate a motor vehicle, navigate surroundings safely without assistance, and perform routine daily activities without specialized visual aids or care.

318. Plaintiff has incurred, and will continue to incur for the remainder of his natural life, substantial economic obligations for specialized neuro-ophthalmological care, low-vision therapy, occupational rehabilitation, assistive technologies, and adaptive home and lifestyle modifications necessary to accommodate permanent legal blindness.

## EQUITABLE TOLLING OF STATUTES OF LIMITATIONS/PRESCRIPTIVE PERIOD

319. Defendants are estopped from relying on the statute of limitations and/or prescriptive period defense because Defendants actively concealed information concerning known risks, side effects, and defects in Mounjaro and/or Ozempic. Instead of revealing such information to the FDA or the public, Defendants have continued to represent Mounjaro and/or Ozempic as safe for their intended use.

320. Defendants are and were under a continuing duty to disclose the true character, quality and nature of risks and dangers associated with Mounjaro and/or Ozempic. Because of Defendants' purposeful and fraudulent concealment of material information concerning the true character, quality and nature of risks of such Products, Defendants are estopped from relying on any statute of limitations and/or prescriptive period defense.

## DEMAND FOR JURY TRIAL

321. Plaintiff demands a trial by jury on all the triable issues within this pleading.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein, and prays for judgment in his favor and against Defendants on each of the above-referenced claims and Causes of Action, awarding the following relief:

a. Full compensatory, actual, and general damages to Plaintiff, DONALD H. TIPTON, for past and future damages, including but not limited to pain and suffering for severe and permanent personal injuries sustained by Plaintiff, DONALD H. TIPTON, in an amount to be determined at trial and as provided by applicable law;

b. Past, present, and future medical expenses, pharmaceutical expenses, specialized visual care costs as provided by law;

c. Pre-judgment and post-judgment judicial interest from the exact date of judicial demand until fully paid;

d. The cost of these proceedings, including court costs and other litigation expenses; and

e. Any other equitable, just, or proper relief the Court may deem just and proper.

Date: September 1, 2026 By: ______________________

Kristie M. Hightower
LA Bar No. 31782
**Lundy LLP**
501 Broad Street
Lake Charles, LA 70605
T: (337) 439-0707
khightower@lundyllp.com

*Counsel for Plaintiff*